

**Dated: July 19, 2019**

**The following is ORDERED:**

Janice D. Loyd
U.S. Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| David A. Stewart, | ) | Case No. 15-12215-JDL |
| Terry P. Stewart | ) | Ch. 7 |
| | ) | **Jointly Administered** |
| Debtors. | ) | |

**OPINION AND ORDER ON MOTION TO COMPROMISE**

**I. Introduction**

Seeking to determine whether three of four pending adversaries should be settled and numerous non-debtor parties be released from possible liability, the Court conducted fourteen (14) days of hearings consuming more than 2,700 pages of trial transcript,[1] reviewed hundreds of exhibits consisting of thousands of pages, and heard the live testimony of seven witnesses (plus four more by deposition) to decide if it should approve the Debtors' and the Trustee's joint motion to compromise controversy. Before the Court

---

[1] Hearings conducted on August 28-31, September 1, October 2, and December 20-22, 2017, January 10-12, and February 26-27, 2018.

for decision is the *Second Joint Motion to Approve Compromise and Settlement Agreement*[2] filed jointly by the Trustee, Douglas N. Gould (the "Trustee") and the Debtors, David A. Stewart and Terry P. Stewart (collectively and individually, "Debtor", "Debtors", "Stewart" or "Stewarts") on October 2, 2017 (the "Motion to Compromise") [Doc. 472]; the *Statement of Support for Second Motion to Settle* filed by Kirkpatrick Bank on October 10, 2017 [Doc. 486]; and *SE Property Holdings, LLC' s* ("SEPH") *Opposition to Second Joint Motion to Approve Compromise* filed on October 12, 2017 (the "Opposition") [Doc. 487].

The Trustee and the Debtors have reached an agreement for settlement of pending adversary proceedings for fraudulent transfer, equitable subordination (against Kirkpatrick Bank) and for substantive consolidation of numerous non-debtor affiliates of the Debtors. The settlement also calls for the Trustee on behalf of the Debtor estates to release the Debtors and their agents, servants, employees, representatives (excluding attorneys),

_____

[2] The compromise and settlement was originally brought before the Court upon the *Joint Motion to Approve Compromise and Settlement Agreement* filed on May 11, 2017 [Doc. 408]. The Settlement Agreement for which approval of the Court was sought provided "in the event the Bankruptcy Court Approval does not occur within sixty (60) days of the filing of the Compromise Motion, this Agreement shall become null and void." [Doc. 408-1, ¶ 13]. Thus, the original termination date for Court approval was July 10, 2017. That was later extended by agreement of the parties to October 1, 2017. [Doc. 428; Also see Stipulation, Adv. 16 -1002, Doc. 81].

Although the Court had commenced hearings on August 28 through September 1, 2017, the matter had not been concluded and was continued to October 2, 2017; however, there had not been a written agreement as required by the Agreement extending the deadline for Court approval beyond October 1, 2017. Accordingly, on October 2, 2017 the Court instructed counsel for the Trustee and Stewart that if they wanted the compromise approved they should file an Amended Motion containing a new deadline for approval. On October 2, 2017 the Trustee and Stewart filed their *Second Joint Motion to Compromise* rendering the original motion moot. [Doc. 478, Order mooting the original joint motion]. It was agreed between the parties, however, and approved by the Court, that all evidence which had been introduced in the hearings on the original motion would be deemed admitted for all purposes in any ongoing hearings on the amended motion. By a series of written amendments to the Settlement Agreement which had been approved by the Court the deadline for approval has now been extended until July 31, 2019 [Doc. 702].

2

family members, affiliates, and lenders from any and all claims, exclusive of any claim by creditor SEPH's objecting to the Debtors' discharge or the dischargeability of their debt to SEPH.[3]  The settlement calls for the payment of $750,000.00 to the Trustee and the Debtor estates.  The Trustee and the Debtors, with the support of Kirkpatrick Bank, now seek approval of the settlement agreement pursuant to Fed.R.Bankr.P. 9019.[4]  The Debtors' two largest creditors are SEPH, holding a claim of between $20 to $30 million, and Kirkpatrick Bank, holding a claim in excess of $12 million.  No creditor or party in interest, other than SEPH, has filed an objection to the proposed settlement.

The Trustee and the Debtors argue that the proposed settlement should be approved because it is supported by sound business justification and is reasonable.  They also argue that litigation of the fraudulent transfer, substantive consolidation and equitable subordination claims would be complex, highly contested, extremely expensive and, with the exception of the fraudulent transfer claim, would likely be unsuccessful.  Furthermore, even if successful, litigation would not result in any recovery for the estates given the absence of equity in both the Debtors' property and the property of the non-debtor entities sought to be consolidated.

SEPH argues that the estates have very strong causes of action against non-debtor entities affiliated with the Debtors for both substantive consolidation and fraudulent transfer

---

[3] The pending adversary proceeding objecting to the Debtors' discharge is *"SE Property Holdings, LLC, Plaintiff v. David A. Stewart and Terry P. Stewart, Defendants"*, Adv. No. 16-1087.

[4] All further references to "Code", "Section", and "§" are to the United States Bankruptcy Code, Title 11 U.S.C. § 101 *et seq*., unless otherwise indicated.  All future references to "Rule" or "Rules" are to the Federal Rules of Bankruptcy Procedure, unless otherwise indicated.

and a strong case (and a "deep pocket") for its equitable subordination claim against Kirkpatrick Bank. Thus, SEPH believes that the probable outcome of the litigation outweighs the expense (which SEPH points out that it, and not the trustee or estate, has borne the brunt).  SEPH argues that the $750,000 settlement figure is coming only from Kirkpatrick Bank from the sale of one oil and gas property owned by non-debtor affiliate Raven Resources, LLC ("Raven"), and that Debtors, family members, affiliates and Kirkpatrick Bank are receiving releases without having parted with any consideration.

To support its belief that a greater recovery than the $750,000 proposed by the settlement could be had, SEPH presented evidence that the non-debtor affiliates had sold approximately $4 million worth of oil and gas assets since the time of the hearings on the Debtors' motion to abandon certain personal property at which Debtors had represented to the Court that there was virtually no value in those assets.[5] To further bolster its argument that the $750,000 is an unreasonably low settlement figure, SEPH presented expert testimony which valued the equity of the non-debtor affiliated entities at between $2.253 million (orderly liquidation value) and $4.936 million (fair market value).

Pursuant to Rules 7052 and 9014, the below constitutes the Court's Findings of Fact, and Conclusions of Law upon which is based the exercise of its discretion for this decision.

## II. Jurisdiction

The Court has jurisdiction to hear and determine this contested matter pursuant to

---

[5] The Debtors filed their *Motion for Order Directing Trustee to Abandon Personal Property* on November 3, 2015, [Doc. 214]. An evidentiary hearing was commenced on December 9-10, 2015 and concluded on January 19-20, 2016.  The Motion was denied by the Court on April 13, 2016. [Doc. 328].

4

28 U.S.C. §§ 157(b)(2)(O) and 1334 and the General Order of Reference entered in this District, LCvR 81.4(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper under 28 U.S.C. § 1409. The Court has jurisdiction to enter a final order and judgment upon the *Second Joint Motion to Approve Compromise and Settlement Agreement* before the Court.

### III.  Background

On September 30, 2014, SEPH filed Involuntary Petitions for Relief under Chapter 7 of the United States Bankruptcy Code against the Stewarts in the United States District Court for the Southern District of Alabama, Southern Division. On March 18, 2015, the Alabama Bankruptcy Court entered orders for relief under Chapter 7 of the Bankruptcy Code. On June 12, 2015, the Alabama Bankruptcy Court granted the Stewarts' motion to transfer the bankruptcy cases to this Court. On July 21, 2015, the Stewart cases were jointly administratively, but not substantively, consolidated by this Court [Doc. 137].[6]

Because consideration of the present Motion to Compromise necessarily takes into consideration (1) the determination of the value of the bankruptcy estate which would result from substantive consolidation with non-debtor entities, and (2) an adversary proceeding to recover alleged fraudulent transfers to some of those non-debtor entities, it is important to revisit issues litigated in four days of hearings nearly 3 years ago. On November 3, 2015, the Stewarts filed their *Motion for Order Directing Trustee to Abandon Personal Property* (the "Motion to Abandon") [Doc. 214], by which they sought to have the Trustee

---

[6] An Order for Joint Administration had previously been entered by the Alabama Bankruptcy Court on April 24, 2015. For clarification purposes, this Court entered its Order making clear that the cases are consolidated for procedural purposes only.

5

abandon all of the Stewarts' units or membership interests in three (3) limited liability companies, namely: Raven, Oklamiss Investments, LLC ("Oklamiss"), and Shimmering Sands Development Company, LLC ("Shimmering Sands"). The Stewarts asserted that each of them, David and Terry, currently held a 1% interest in Oklamiss which in turn owned a 99% interest in Raven. Mr. Stewart owned the other 1% interest in Raven, and a 50% interest in Shimmering Sands. The Stewarts asserted that they had conveyed their respective interests in Oklamiss to their three adult children by assignment dated in October 2011, nearly 3 years before the filing of the Involuntary Bankruptcy Petition by SEPH.[7] The Stewarts also alleged that notwithstanding their lack of, or *de minimis*, ownership of those non-debtors, those entities were subject to such debt that there was no equity in the non-debtor entities which would inure to the benefit of the Stewarts' bankruptcy estates. Therefore, the Stewarts argued that any interest they held was of such inconsequential value of, or burdensome to, the estates that it should be abandoned.

The Trustee and SEPH objected to Stewarts' Motion to Abandon [Docs. 220 & 221]. The Trustee's and SEPH's position was that the Stewarts' disposition of their interests in the numerous limited liability companies were extremely complicated with the Debtors having interests in over thirty-three (33) limited liability companies, some active, some inactive; assets in multiple states, including some potential British Petroleum claims associated with the offshore oil spill in the Gulf of Mexico in 2005 and various pieces of litigation pending in multiple states. Discovery early in the bankruptcy produced over 16,000 pages of documents from the Debtors alone and over 4,000 pages from another

---

[7] Prior to this assignment, the Stewarts combined owned 100% of the Oklamiss membership interests.

6

creditor. The transfers of the Stewarts' interests raised serious questions as to whether the same constituted avoidable fraudulent transfers under §§ 544 and 548, and that there had not been sufficient time to properly evaluate the nature of the Stewarts' interests in the non-debtor entities.

After conducting an evidentiary hearing on Stewarts' Motion to Abandon certain property, which lasted four days, comprised 814 pages of transcript, included the testimony of five witnesses and allowed into evidence sixty-seven (67) exhibits,[8] the Court denied the motion on the grounds that the Stewarts had not brought forth sufficient evidence to establish that their membership interests in the various LLCs in question were of inconsequential value or burdensome to the estate. [Docs. 328 & 353].[9] The Court also agreed with the Trustee that it was not convinced that the Debtors had introduced evidence of a full evaluation of the Stewarts' oil and gas properties, in particular those of Raven [Doc. 353, Tr. 25-26], and the denial of the motion would afford the Trustee the necessary time to conduct his investigation of Stewarts' affairs with regard to numerous transactions and entities, including the non-debtors. As of this date none of the Debtors' membership interests in the affiliated LLCs have been abandoned. Among the terms of the proposed settlement would be the abandonment, in return for compensation, of all non-exempt property of the Stewart estates, including the membership interests in LLCs.

On January 5, 2016, the Trustee filed an adversary Complaint against the Stewarts, their three children, Stewart's mother, and non-debtors, Oklamiss, Raven, the Red Britt

---

[8] Transcripts of proceedings are found at Docs. 241, 243, 268 and 270.

[9] The Court's oral ruling was made on April 13, 2016. The Transcript of the proceedings was filed on April 21, 2016.

Irrevocable Trust, and NOG, LLC,[10] alleging claims of fraudulent transfers under § 548 as well as under the Oklahoma Fraudulent Transfers Act. Adversary proceedings for substantive consolidation and for equitable subordination of Kirkpatrick's claim soon followed.

## IV. Standards For Approving Compromise of Controversy

Pursuant to Bankruptcy Rule 9019(a), the authority to approve a compromise settlement is within the sound discretion of the bankruptcy court. *In re Kopexa Realty Venture Co.,* 213 B.R. 1020, 1022 (10th Cir. BAP 1997); *In re Rotert*, 530 B.R. 791, 798 (Bankr. N.D. Okla. 2015); *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D. N.Y. 1991). In exercising this discretion, the bankruptcy court must determine whether the compromise is fair, reasonable and in the best interests of the estate. *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25, 88 S.Ct. 1157 (1968); *In re CS Mining, LLC*, 574 B.R. 259, 272-73 (Bankr. D. Utah 2017); *In re Western Pac. Airlines, Inc.*, 219 B.R. 575, 579 (D. Colo. 1998). A court may exercise its discretion in light of the general public policy that "compromises are favored in bankruptcy." *In re Southern Medical Arts Companies, Inc.*, 343 B.R. 250, 255 (10th Cir. BAP 2006) (citing 10 *Collier on Bankruptcy* ¶ 9019.01, at 9019-2 (Allen N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2006).

In considering what is fair, equitable and in the best interests of the estate, "the bankruptcy court must be apprised of all relevant information that will enable it to determine

---

[10] *"Gould, Plaintiff v. David A. Stewart et. al, Defendants*," Adv. #16-01002-JDL.

what course of action will be in the best interest of the estate." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 394 (3rd Cir. 1996); *Reiss v. Hagmann*, 881 F.2d 890, 892 (10th Cir. 1989) (citing, *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 434, 88 S.Ct. 1157 (1968)).  At the same time as weighing such relevant information, it is not necessary that the bankruptcy court conclusively determine claims that are subject to a compromise, nor must the Court have all the information necessary to resolve the factual dispute, for by doing so, there would be no need of a settlement.  In short, the Court need not conduct  a "mini-trial"[11] but rather "only need  be apprised of those facts that are necessary to enable it to evaluate the settlement and to make a considered and independent judgment about the settlement." *Adelphia Communications Corp.,* 327 B.R. 143, 159 (Bankr. S.D. N.Y. 2005).

Nor is the court required to make a determination that the settlement is the *best* possible compromise. *In re Coram Healthcare  Corp*., 315 B.R. 321, 330 (Bankr. D. Del. 2004).  To put it otherwise, the bankruptcy court need not decide the numerous issues of law and fact raised by a compromise or settlement, "but must only 'canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'" *Adelphia*, 327 B.R. at 159; *In re Dennett*, 449 B.R. 139, 144-45 (Bankr. D. Utah 2011). Because compromise is favored in bankruptcy and the Trustee need only show that his

---

[11] In the present case, having seen and heard evidence for fourteen (14) days, it can certainly be said that the Court conducted something more akin to a "full trial" as opposed to a "mini-trial".  In twenty-nine (29) years of private bankruptcy practice, including twenty two (22) as a Chapter 7 trustee, and more than four years on the bench, the Court has never experienced, let alone even heard of, so much time and effort expended on a motion to compromise. The Court did so to afford the parties as much time as they believed they needed to thoroughly present their cases and to provide the Court with sufficient information to thoroughly evaluate a complex set of facts and legal theories.

9

decision falls within the "range of reasonable litigation alternatives", the Trustee's burden is not high. *In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008).

While the movants carry the burden of persuasion to provide the Court with sufficient information to conclude that the compromise falls within a reasonable range of litigation possibilities, this is not, however, a burden of proof regarding the underlying claims. It is a burden to persuade the bankruptcy court that the compromise is fair and equitable and should be approved. *In re Mickey Thompson Entertainment Group, Inc.*, 292 B.R. 415, 420 (9th Cir. BAP 2003); *In re Vasquez*, 325 B.R. 30, 36 (Bankr. S.D. Fla. 2005) ("The court is neither to 'rubber stamp' the Debtor's proposals nor substitute its judgment for the trustee's.").

In the Tenth Circuit, in considering whether a settlement or compromise is in the best interest of the estate, the court must consider four factors: (1) the probable success of the underlying litigation on the merits, (2) the possible difficulty in collection of a judgment, (3) the complexity and expense of litigation, and (4) the interests of creditors in deference to their reasonable views. *Kopexa*, 213 B.R. at 1022; *Southern Medical Arts*, 343 B.R. at 256; *Martin*, 91 F.3d at 393. Some courts, including this one, also give consideration as to whether the proposed settlement promotes the integrity of the judicial system. *In re Kallstrom*, 298 B.R. 753, 761 (10th Cir. BAP 2003); *In re Bates*, 211 B.R. 338, 343 (Bankr. D. Minn. 1997); *In re Hale-Halsell Co.*, 391 B.R. 459, 466 (Bankr. N.D. Okla. 2008); *Rotert*, 530 B.R. at 798 ("promotion of the integrity of the judicial system is of paramount importance in the area of discharge litigation...when dealing with the settlement of objections to discharge.").

10

**A. Probability of Success**.

At the outset, the Court wants to make clear that it is not saying one way or the other that there is a guaranteed victory by either the Debtors or SEPH in the various pieces of pending litigation. Nor is it pre-judging how it would rule in those cases. The Court is not required to, "decide the numerous questions of law and fact." *In re Rich Global, LLC*, 652 Fed.Appx. 625, 631 (10ᵗʰ Cir. 2016) (quoting 8 *Norton Bankruptcy Law & Practice* §167.2). All the Court is saying is that for purposes of settlement, judged by the *Kopexa Factors,* which side appears to have the better argument. There are three separate adversary proceedings which would be resolved if the settlement is approved.

**1. The Fraudulent Transfer Adversary.**[12]

In this action the Trustee seeks to avoid (recover) fraudulent transfers made by the Debtors to their children and to the Red Britt Irrevocable Trust of which David Stewart's mother was the settlor. The evidence adduced at the fourteen day hearing on the Motion to Compromise and the earlier four day hearing on the Debtors' Motion to Abandon established that the Stewarts had together owned 100% of Oklamiss from the time of its establishment in 1999 until October 31, 2011. In turn, Oklamiss owned a 99% ownership interest in Raven. The Stewarts' financial statements prepared in May 2011 reported that Oklamiss owned real estate worth more than $4.2 million, Raven had a value of $20 million and the Stewarts had a net worth of nearly $20 million.

On October 31, 2011, the Stewarts conveyed 98% of their membership interest in

---

[12] "*Douglas N. Gould, Plaintiff v. David A. Stewart, Terry P. Stewart, Thad Stewart, Neil Stewart, Janice Stewart Rush, Oklamiss Investments, LLC, Raven Resources, LLC, the Red Britt Irrevocable Trust, and NOG, LLC,*" Adv. No. 16-1002.

Oklamiss to their three children receiving no value in exchange for the membership interests. These transfers were accomplished at a time when the Stewarts were indebted to SEPH for approximately $19 million.[13] Notwithstanding the alleged transfer of their interest to the children, the Schedule K-1 to both their 2012 and 2013 income tax returns did not reflect a transfer of their interests to their children so that the Stewarts could personally claim losses related to Oklamiss in excess of $2 million for taxable year 2012 and $330,000 for taxable year 2013. Further financial statements provided to Kirkpatrick Bank continued to represent that they owned 100% of Oklamiss and Raven. Following the transfers, David Stewart retained control over both Oklamiss and Raven as their manager, and the profits and losses from Oklamiss were assigned by the children back to the Stewarts. The Stewarts did not reveal the transfers to either their in-house counsel or their accountant until more than a year after they had occurred.

David Stewart, acting as manager for Raven, also transferred interests in multiple oil and gas properties owned by that entity as well as other entities formed by him, namely NOG, LLC, and OOG, LLC, to the Red Britt Irrevocable Trust, to which David Stewart's mother was the settlor, David Stewart's daughter was the trustee and David Stewart was the primary beneficiary.[14] The Trust was formed on July 23, 2014, based on the execution date by David Stewart's mother, notwithstanding that numerous transfers into the trust were dated prior to the formation, and all took place after litigation by SEPH had been

---

[13] SEPH did not commence actual litigation against the Stewarts until April 2013, with a second lawsuit filed in 2014.

[14] Stewart's daughter testified by deposition that she has not made any directives with regard to the trust except to purchase Oklahoma University football tickets.

commenced.  The Red Britt Irrevocable Trust was formed at the suggestion of David Stewart.

The Stewarts assert that the various transfers were made as a probate-avoidance measure at a time when David Stewart was having health problems and not to hinder or defraud their creditors.  In both the hearings on the Motion to Compromise and the Debtors' Motion to Abandon, the Court heard several days of testimony and numerous exhibits specifically directed at the issue of the fraudulent conveyances which are the subject of the adversary proceeding.  In hearings on the Motion to Abandon and the present Motion to Compromise, to a great degree the parties already tried this adversary on its merits.

Pursuant to § 548(a)(1), the trustee may avoid transfers of the debtor's property made within two (2) years before the filing of the bankruptcy petition if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became... indebted." 11 U.S.C. § 548(a)(1)(A).  Section 548 (a)(1)(B) authorizes the trustee to avoid transfers on somewhat different grounds.  If the debtor "received less than reasonably equivalent value" in exchange for a transfer of the debtor's property, the trustee may avoid the transfer if several additional elements are established.[15]

---

[15] 11 U.S.C. § 548(a)(1)(B) states that the trustee may avoid transfers made within two (2) years of the filing of the bankruptcy petition if he establishes that the debtor: (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

13

The Trustee testified that although he was moving to settle the adversary, he believed he would have prevailed on the fraudulent transfer action, and given the strength of his case would likely have prevailed on a motion for summary judgment which counsel for SEPH had prepared for the Trustee's filing.  [Doc. 545, Tr. 1314; Doc. 466-4, Tr. 1201].[16]   In addressing the "probability of success in litigation" in their Motion to Compromise, the Trustee and the Debtors conceded that "for purposes of this analysis, we can assume that the Trustee would be successful." [Doc. 472, pg.17].  So strong was the evidence supporting the fraudulent transfer action, particularly under § 548(a)(1), that this Court had remarked during the course of the hearing on the motion to compromise that counsel for SEPH was "making a compelling argument as to whether or not (the Trustee) would be successful on the fraudulent transfer action..." [Doc. 466-1, Tr. 432].  Although fraudulent intent is often difficult to determine by summary judgment rather than by a trial on the merits, suffice it to say that in this Court's opinion there exists a high degree of probability that the Trustee would ultimately be successful.  Accordingly, the Court finds that probability of success in this adversary proceeding is high and is a factor militating against settlement.

### 2. The Substantive Consolidation Adversary.[17]

Perhaps the most hotly contested adversary, or at least the one having generated

---

[16] References to the hearing transcript of the *Second Joint Motion to Compromise and Settlement Agreement* under consideration is by the Document Entry on the docket sheet at which the transcript is found followed by the page number of the cumulative hearing testimony (from August 28, 2017, to February 27, 2018, pages 1 through 2736) shown on the upper right-hand corner of the page of the transcript.

[17] *"SE Property Holdings, LLC, Plaintiff v. David A. Stewart, Terry P. Stewart, Raven Resources, L.L.C., Oklamiss Investments, LLC, NOG, LLC, OOG, LLC, NBV, LLC, Shimmering Sands Development Company, LLC, Hughes Oil and Gas LLC and Red Britt Irrevocable Trust, Defendants,"* Adv. Case No. 16-01117-JDL.

14

the most paper, is SEPH's action to have the Court approve the substantive consolidation of non-debtor affiliates of the Stewarts into their jointly administered bankruptcy cases. There are no provisions in the Bankruptcy Code that specifically authorize the bankruptcy court to approve substantive consolidation of separate entities and, certainly consolidating debtors and non-debtors. Instead, based upon equitable principles, judicially developed standards have been developed to determine whether substantive consolidation should be granted in any given case.

Substantive consolidation is a highly controversial subject in the bankruptcy jurisprudence. There is a split of authority as to whether a bankruptcy court has the authority to substantively consolidate non-debtors assets and liabilities into a bankruptcy debtor's estate. The Tenth Circuit has recognized the doctrine of substantive consolidation, although it is regarded as an extreme remedy to be exercised as one of last resort after considering and rejecting other remedies available under the Bankruptcy Code. *Federal Deposit Ins. Corp. v. Hogan (In re Gulfco Investment Corp)*. 593 F.2d 921 (10th Cir. 1979); *Castle Arch Real Estate Investment Co., LLC*, 2013 WL 492369 (Bankr. D. Utah 2013). This Court, in this very case, has recognized the doctrine. *SE Property Holdings, LLC v. Stewart (In re Stewart),* 571 B.R. 460 (Bankr. W.D. Okla. 2017); See also, *In re Kretchmar*, 579 B.R. 924 (Bankr. W.D. Okla. 2018) (this Court, while recognizing the doctrine, refusing to apply it to consolidate individual debtors with individual non-debtors).

Amongst the equitable criteria which courts consider in determining the appropriateness of substantive consolidation are (1) the extent to which the entity to be substantively consolidated was managed or controlled by the debtor, (2) whether the entity

15

to be substantively consolidated had an economic existence independent from the debtor, (3) creditors who are proponents of substantive consolidation must show they actually and reasonably relied upon debtors supposed unity with a non-debtor entity, (4) consolidation is necessary to avoid some harm or to realize some benefit, and (5) if a creditor objects on the grounds that it relied on the separate credit of one of the entities to its prejudice consolidation may be ordered only if the benefits heavily outweigh the harm. *Kretchmar* 579 B.R. at 932*; In re Schupbach Investments, LLC*, 2012 WL 3564159 (Bankr. D. Kan. 2012) (relying, in part, on *In re Auto-Train Corp.*, 810 F.2d 270 (D.C. Cir. 1987)); *In re Owens Corning*, 419 F.3d 195 (3rd Cir. 2005).

There is presently pending before the Court the Debtors' and Kirkpatrick Bank's Motions to Dismiss [Adv. 16-1117, Docs.197 & 198] SEPH's *Second Amended Complaint for Substantive Consolidation and an Accounting Pursuant to 11 U.S.C. §105* [Adv. 16-1117, Doc. 189] predicated upon the Second Amended Complaint's failure to state a claim under Rule 7012(b)(6). The Court has been holding a decision on the Motions to Dismiss in abeyance pending the resolution of this Motion to Compromise. Prior to the present pending Motions to Dismiss, the Court had sustained previous Motions to Dismiss SEPH's original Complaint and Amended Complaint for failure to state a claim. The original Complaint was dismissed (without prejudice to refiling) because it failed to allege facts (1) identifying creditors of the non-debtors sought to be dragged into the Stewarts' bankruptcy; (2) how those creditors would benefit from substantive consolidation; and (3) how in SEPH's pre-petition course of dealing with the Stewarts it actually and reasonably relied upon the supposed unity of the Stewarts and the non-debtor entities. [Adv. 16-1117, Doc.

141].

The Amended Complaint alleged that the only known creditor of non-debtor affiliates besides Kirkpatrick Bank, Legacy Reserves holding a $3.5 million judgment against non-debtor Raven, had notified the Trustee of its desire to participate in Stewarts' bankruptcy proceedings.  Legacy Reserves, however, filed a Statement of Position [Adv. 16-1117, Doc. 161] in which it made clear its opposition to its debtor, Raven, being substantively consolidated into the Stewarts' bankruptcy.  In part because a major creditor of Raven was opposed to substantive consolidation, the Court granted the Debtors' and Kirkpatrick's Motion to Dismiss with prejudice. [Adv. 16-1117, Doc.163]. The Court subsequently sustained SEPH's motion to vacate the order of dismissal when it was revealed that prior to the Court's order of dismissal, Kirkpatrick had purchased the Legacy Reserves' judgment against Raven, thus eliminating the only objection to substantive consolidation by an arms-length, non-litigant party creditor.  Furthermore, in opposing the Motion to Vacate, Raven  and Oklamiss attached copies of their accounts payable showing debts of approximately $3.1 million in the case of Raven and $556,000 in the case of Oklamiss. The Court thus vacated its prior order of dismissal with prejudice and dismissed the Amended Complaint without prejudice with leave granted to SEPH to show how the additionally identified creditors would be benefitted, or not harmed, by substantive consolidation. [Adv. 16-1117, Doc. 187].

SEPH then filed its Second Amended Complaint for substantive consolidation.  The Second Amended Complaint added new allegations that addressed the Court's concern that the First Amended Complaint had not pled facts stating how the additionally named creditors would be benefitted or not be harmed by substantive consolidation.  SEPH

17

alleged the creditors of Raven, including the joint interest billing creditors, were not being paid and funds which might be available to them were being diverted "to siphon off dividends to aid Kirkpatrick rather than allowing other creditors to reap benefits from the sales of Raven's assets." [Adv. 16-1117, Doc. 203, pg. 9].  Though SEPH does not say it in so many words, SEPH's position is that Kirkpatrick's protestations to substantive consolidation ring hollow in light of it having been largely responsible for latching onto the assets of the non-debtors and applying them to the Stewarts' debts, including Raven, to the detriment of the non-debtors' creditors.

In support of its substantive consolidation claim SEPH has argued, and presented evidence, that the non-debtor entities have been operated as a single enterprise because they had the same employees, accountants and have been controlled by David Stewart as manager (either formally or *de facto*).  This fact, however, is not unusual for closely held family corporations or limited liability companies.  There was also evidence introduced that the financial affairs of the non-debtor entities were inextricably intermingled, with cash being transferred from one entity to another to pay bills when the transferee entity was unable to pay its obligations and the making of supposed inter-company loans without any documentation.  This evidence is supportive of a claim for substantive consolidation.

On the other hand, the evidence was weak, or nonexistent, as to creditors of the non-debtor entities (in particular, Raven), other than Kirkpatrick Bank, that had relied upon the Stewarts, when extending credit to the non-debtor affiliates.  Moreover, the protagonist in this litigation, SEPH, while a creditor of the Stewarts *was never a creditor of Raven or Oklamiss* so that it could show that in its pre-petition dealings it actually and reasonably relied upon the Stewarts *and* the non-debtor entities' supposed unity.  Perhaps most

18

importantly, it must be shown that substantive consolidation will benefit all of the creditors. Since the assets and liabilities of the non-debtors would be merged into one "pool" there would be a greater "pool" of assets to pay all creditors; however, it is hard for this Court to see how creditors of the non-debtors would not be harmed by having their claims diluted by the $20-30 million plus claim of SEPH who has never been a creditor of the two major non-debtor entities, Raven and Oklamiss.  The Trustee testified that he does "not believe that substantive consolidation is warranted, and that there is insufficient evidence to support it." [Doc 545, Tr. 1261].

Unlike the fraudulent transfer adversary, the probability of success of the substantive consolidation adversary is a much closer call.  There are both factors militating in favor of substantive consolidation and other factors against it.  In the Court's opinion, the largest obstacle to substantive consolidation is the inability of SEPH to convince the Court that all of Raven's creditors would be benefitted, or not harmed, by the dilution of their claims in a bankruptcy where SEPH has a $20-30 million claim. When coupled with the judicial policy of only employing substantive consolidation as a last resort in the rarest of cases, the Court finds that the probability of success in prosecuting the adversary is at best 50%.  By the slightest of margins, this makes the probability of success weigh in favor of settlement.

### 3. The Equitable Subordination Adversary.[18]

---

[18] *"SE Property Holdings, LLC Plaintiff v. Kirkpatrick Bank, Defendant,"* Adv. No. 17-1051-JDL. The Court presently has pending before it Kirkpatrick Bank's *Motion to Dismiss* [Adv. 17-1051, Doc. 14].  The Motion is predicated upon Kirkpatrick Bank's assertion that (1) the Court does not have jurisdiction over this non-core action between non-debtors relating to assets which are not property of the bankruptcy estate, and (2) SEPH lacks standing to bring this action on behalf of the estate because the claims belong, if at all, to the trustee, and SEPH was required to first seek leave

SEPH filed suit against Kirkpatrick Bank for equitable subordination of its claims against the Stewarts and Raven under Bankruptcy Code § 510(c) and to recover post-petition transfers (payments, mortgages, security interest and assignments) which it received from the assets of non-debtors, particularly Raven pursuant to §§ 549 and 550. A bankruptcy court may equitably subordinate the claim of one creditor to the claims of other creditors if three requirements are met: (1) "inequitable conduct" on the part of the claimant is sought to be subordinated; (2) injury to the other creditors of the bankrupt or unfair advantage for the claimant resulting from the claimant's conduct; and (3) consistency with the provisions of the Bankruptcy Code. *In re Hedged–Investments Associates, Inc.,* 380 F.3d 1292, 1300 (10th Cir. 2004). The Tenth Circuit has placed special emphasis on the inequitable conduct prong: "The critical inquiry is whether there has been inequitable conduct on the part of the party whose debt is sought to be subordinated." *Sloan v. Zions First National Bank (In re Castletons, Inc.)*, 990 F.2d 551, 559 (10th Cir. 1993). "Inequitable conduct" for subordination purposes encompasses three categories of misconduct: "(1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor is a mere instrumentality or alter ego." *Hedged–Investments Associates, Inc.,* 380 F.3d at n. 9. This includes cases "in which a fiduciary of the debtor misuses its position to the disadvantage of other creditors; those in which a third-party, in effect, controls the debtor to the disadvantage of others; and those in which a third-party defrauds other creditors." *Id.*

---

from the Court to file the action. SEPH did not obtain permission from the Court to file the suit. SEPH has filed a *Motion to Approve Nunc Pro Tunc SEPH's Pursuit of Claims on Behalf of Estates* in which it seeks retroactive approval of bringing the adversary based on the Trustee's reluctance to do so. [Doc. 492]. The Motion remains pending.

Kirkpatrick Bank's allegedly inequitable conduct rests primarily on four grounds: First, in August 2016, after Kirkpatrick Bank purchased from Interbank its $6.5 million note with Raven, it entered into a Sixth Amendment to the Loan Agreement which rolled into one obligation the previous Interbank-Raven debt along with the previous Park Cities-Raven debt (acquired by Kirkpatrick Bank), and secured the debt with all previous collateral as well as approximately 180 previously unencumbered oil and gas properties of Raven.[19] This resulted in the post-petition encumbrance of virtually all of Raven's assets to Kirkpatrick Bank and eliminating or dissipating the equity in the membership interest of Raven which was property of the Stewart bankruptcy estate.[20]

Second, in May 2015, Legacy Reserves obtained a judgment against Raven for approximately $3.5 million in the District Court of Midland, Texas.  In February 2017, Legacy Reserves domesticated its judgment in the District Court of Oklahoma County, Oklahoma, and perfected its judgment lien in six Oklahoma counties where Raven owned oil and gas properties.  In August 2017, Legacy Reserves assigned its judgment and judgment liens to Kirkpatrick Bank.  SEPH contends that by the acquisition of the Legacy Reserves liens, "Kirkpatrick has continued its post-petition pattern of acquiring Raven Resources' debt and improving its security position in relation to other creditors despite its knowledge of the limitations on it given its inequitable conduct." [Adv. 17-1051,  Doc. 1,  ¶

---

[19] Though the previously unencumbered oil gas properties were mortgaged to Kirkpatrick Bank in August 2016, most of the mortgages were not perfected by filing in the appropriate counties until November 2016.

[20] The interest of the Debtor estate in Raven is 1%.  Raven is owned 99% by Oklamiss. To reach any other interest of Raven or Oklamiss, the fraudulent transfer action and/or the substantive consolidation action would have to be resolved in favor of the estates.

59].

On the other hand, Kirkpatrick Bank's President testified that after domesticating its judgment in Oklahoma, Legacy Reserves began filing liens and issuing garnishments to oil and gas producers thus threatening Raven's ongoing oil and gas production which was Kirkpatrick Bank's primary collateral. [Doc. 466-3, Tr. 906]. If Kirkpatrick Bank hadn't bought Legacy Reserves' judgment and liens, Raven would not have been able to sell any of the properties without Legacy Reserves consent.  Kirkpatrick Bank thus asserts that its purchase of the Legacy Reserves' judgment and liens was not an "inequitable" action but a reasonable act on its part to protect its interest.  The Court agrees with the Trustee that Kirkpatrick Bank's acquisition of the Legacy judgment was not illegal or improper but, rather, a "very good, wise, sound business judgment decision." [Doc 567, Tr. 2619].

Third, in April 2017, Kirkpatrick Bank filed suit against Raven for approximately $3 million based on Raven's guaranty of Oklamiss debt.  Kirkpatrick Bank claims that the suit was necessitated by Legacy Reserves' actions to enforce its judgment in Oklahoma which constituted a non-monetary breach of the terms of Raven's loan agreements with Kirkpatrick Bank.  A week after suit was filed, Raven consented to the entry of a judgment against it.  Kirkpatrick Bank then recorded judgment liens in approximately twenty-two counties, encumbering any oil and gas properties of Raven in those counties. SEPH asserts that the "consensual" nature of the judgment and the acquisition of judgment liens pursuant thereto was in violation of the Preliminary Injunction which the Court had entered on January 5, 2017 [Adv. 16-1002, Doc. 33], and which was agreed to by Kirkpatrick Bank's counsel.

While approving the Preliminary Injunction, Kirkpatrick Bank was not an enjoined

22

party. The Preliminary Injunction prohibited the Stewarts, and their non-debtor affiliates, from "assigning, encumbering, hypothecating, and/or otherwise conveying any assets" owned by them to a third-party. There is little doubt in the Court's mind that the consensual nature of the judgment and recording of the judgment liens was violative, at least by the Stewarts, of the spirit, if not the letter, of the Preliminary Injunction.

Fourth, after SEPH's filing of the involuntary bankruptcy against the Stewarts in September 2014, and extending into 2017, David Stewart, acting as the manager of Raven, assigned (sold) numerous oil and gas properties "without notice to or authorization from the Court or the Trustee" as part of the Debtor's "pattern or practice of defrauding creditors, in part by transferring assets out of the Stewart Entities to decrease the value of the bankruptcy estate ... through the aid and conduct of Kirkpatrick." [Adv. 17-1051, Doc. 1, ¶ 30]. The proceeds of these sales or assignments were used to pay operating expenses of Raven, as well as to reduce the debts owed to Kirkpatrick Bank by Raven, the Stewarts and/or Oklamiss. In some instances, the proceeds were paid to Kirkpatrick Bank even though Kirkpatrick Bank did not hold a mortgage on the property sold. These proceeds, SEPH claims, were "disguised distributions" which should have inured to the membership interests of the Stewarts' bankruptcy estates and thus should be recovered from Kirkpatrick Bank.

SEPH's Complaint also includes a claim that the mortgages taken under the terms of the Sixth Amendment to the Loan Agreement should be avoided. However, even if the mortgages were avoided, the monetary obligation under the Sixth Amendment would still exist and would constitute an unsecured liability which has to be paid before there could

be any distribution to equity (the Stewarts' membership interests) of Raven and/or Oklamiss.

Kirkpatrick Bank undoubtedly has the financial capability of responding to any judgment rendered against it. [Doc. 466-4, Tr. 1066]. That is a strength of SEPH's claim against Kirkpatrick Bank. The greater question, however, is did Kirkpatrick Bank's post-petition conduct "cross-the line" between "doing what banks do" to protect its interest and assisting the Stewarts in fraudulent conduct in violation of the Bankruptcy Code. The Court deems the probability of success of this adversary less than that of the fraudulent transfer adversary but probably greater than the action for substantive consolidation.

**B. The Complexity and Expense of Litigation.**

If anything is a certainty in this bankruptcy case it is that the litigation is both complex and expensive. As recounted above, there are being litigated issues of fraudulent conveyances, substantive consolidation, equitable subordination, complex evaluation of oil and gas interests (producing, non-producing, leasehold), disgorgement of attorney's fees (which issue has already been appealed) and dischargeability. The substantive consolidation and equitable subordination claims are still in the pleading stage with pending motions to dismiss. Nearly twenty full days of hearings have been held just on the issues of whether the Trustee should abandon certain property and whether this settlement should be approved. The docket sheet in the main bankruptcy case has over 700 entries. The adversary proceedings contain over 400 entries. Tens of thousands of pages of documents have been produced in discovery. Thousands of pages of exhibits have been introduced at motion hearings. Going forward, given the thoroughness and tenacity with

which these cases have been litigated, there is no doubt there will be extensive motion practice, briefing on dispositive motions, preparation for trial and almost certain appeals.

The prior costs already incurred by the estate and the parties are largely irrelevant in the determination of whether a current settlement proposal is in the best interests of the estate. The fact that the bankruptcy has been costly thus far does not automatically compel the conclusion that probable future expenses militate in favor settlement. The issue at hand is whether the net benefits of *this* litigation going forward are outweighed by the value of the proposed settlement. That being said, "What's past is prologue,"[21] and looking at the cost and manner of what has to this point been litigated gives some idea of future expenses. The tenacity, nay animosity, with which this case has been litigated is likely to continue in the future. That is also a factor in elevating the time and expense going forward.

There is evidence in this case that the attorney's fees paid to Stewarts' counsel already exceed $400,000. The Court assumes that the fees paid to counsel for SEPH is a multiple of that figure. SEPH's lead counsel (two attorneys) live in Alabama with the attendant expense of time and travel. SEPH has two Oklahoma City law firms acting as local counsel in the various pieces of litigation. The Court has already approved $62,000 in fees for the Trustee's counsel. Four expert witnesses have testified regarding the valuation of the oil and gas interests. SEPH's principal expert witness testified that he had been paid approximately $190,000 *prior* to attending and testifying at the fourteen day hearing on the Motion to Compromise. Kirkpatrick Bank has two counsel working on the

---

[21] William Shakespeare, *The Tempest*.

case(s). This has been and will continue to be, if not resolved, very expensive litigation.

In considering the cost of litigation as a factor in settlement determination, the Court must also consider mitigating factors. First, SEPH obviously believes that the costs are outweighed by the probable outcome of the litigation. Secondly, SEPH has argued that it, not the Trustee and the bankruptcy estates, has borne the brunt of all legal expense to this point and will continue to do so going forward. It is not disputed by the Trustee that SEPH has taken the lead in the case in terms of discovery, briefing and pleading. Even considering the financial benefit of SEPH's taking the lead in a future litigation, the cost to all parties, including the Trustee's attorney fees to be paid from the estate, is going to be substantial. This militates in favor settlement.

### C. Deference to the Views of Creditors.

While creditors' objections are not controlling, emphasis is placed on the paramount interest of creditors and proper deference given to reasonable views set forth in their objections. *Kopexa*, 213 B.R. at 1022. See also *In re Martin,* 91 F.3d 389, 393 (3rd Cir. 1996); *In re American Reserve Corp.*, 841 F.2d 159, 161-62 (7th Cir. 1987); *In re A & C Properties*, 784 F.2d 1377, 1382 (9th Cir. 1986). SEPH with a claim of approximately $30 million is by far the largest creditor of the Stewarts, holding approximately 90% of the claims. It was at least entitled to its views being heard by the Trustee in his evaluation of whether settlement was in the best interest of the creditors.

The Trustee did testify that he considered the positions of the unsecured creditors with regard to the compromise. [Doc. 545, Tr. 1277]. Trustee testified that he did not consult with counsel for SEPH about the proposed settlement agreement before he

entered into it.  In fact, the Trustee acknowledged that he did not call or "give deference" to SEPH's views. [Doc. 545-1, Tr. 1512].[22]  The reason for this lack of communication was because "in all my experience requests of them (SEPH) for an offer of settlement or what they would settle for went unanswered", and SEPH's position "in my opinion defies explanation." [Doc. 545, Tr. 1280].[23] Regardless of whether the Trustee gave proper deference to the interest and views of SEPH, the Court, as demonstrated by the length of the hearing and size of the record, has given considerable deference to SEPH's position in determining whether the proposed settlement is in the best interest of the estate and the creditors.

### D.  Likely Difficulty in Collection.

While all of the *Kopexa Factors* are important, this one consumed the most trial time, presented the most exhibits, and was the most difficult for the Court to decipher.  It was also probably the factor entitled to the most weight.  Consideration of this factor took the form of a multi-day valuation hearing.  Primarily at issue was the determination of the value of the non-debtor affiliates (primarily Raven and Oklamiss) and the Stewarts' membership interests in each. The affiliates were viewed by SEPH's experts both separately and "collectively" as if they and the Stewarts were regarded as one entity, as

---

[22] While at one point the Trustee testified that he did not give "deference" to the reasonable opinion of SEPH, he also testified in the hearing that, "I've given deference to the positions of SEPH, and I came away – I've come away with the feeling that I'm trying to save them from themselves." [Doc. 545, Tr. 1280].

[23] The Trustee explained that he had "on several occasions asked their (SEPH) attorneys what they want, what kind of number do they need, what kind of settlement would be acceptable to them and he had not received an answer, which leads me to the conclusion that there is no amount that's acceptable to SEPH in terms of settling all the differences and concluding the Stewart Chapter 7 short of pursuing litigation to conclusion." [Doc. 545, Tr. 1278].

if substantive consolidation had been allowed.  Would the value of the Stewart property when combined with the non-debtor affiliates allow a greater recovery for the creditors than the $750,000 available by the proposed settlement?

There was some, but not in the Court's opinion a definitive, dispute as to the Trustee's evaluation of the non-exempt real and personal property of the Stewarts which would have been available for distribution to creditors. The Trustee placed the value of the Stewarts personally owned real and personal property at $150,000 comprised of: (1) an unimproved lot adjacent to their residence–$100,000; and (2) personal property comprised of jewelry ($35,000), household goods, paintings, photographs, firearms and a Jeep, in the aggregate of $50,000.  As part of the proposed settlement the Trustee is abandoning the estates' interest in the real and personal property for the sum of $150,000.

The real bone of contention was the Trustee's acceptance for settlement purposes of $600,000 for all the membership interests of the Stewarts in the affiliated-non-debtor entities.[24]  Before the Stewart bankruptcy estate could benefit from any membership interest in one of the non-debtor affiliates, primarily Raven and Oklamiss, the Trustee would first have to liquidate the assets of those entities, satisfy the secured debt to Kirkpatrick Bank, and pay the affiliates' unsecured debt.  Only if there was anything left over would the Stewart estates (and their creditors) benefit. [Doc. 466-4, Tr. 1186].

The Trustee testified that he had reviewed and included in his valuation each of the non-debtor affiliates, and he concluded that there was no positive equity interest in the Stewarts' membership, or other ownership interests. [Doc. 466-4, Tr. 1166-67, 1171].   It

---

[24] The "affiliates" are defined in ¶ 1.1 of the Settlement Agreement.

28

was irrelevant as to whether the Stewarts owned 1% or 100% of an affiliate-a zero equity in an asset was still of zero value to the estate regardless of the percentage of ownership. [Doc. 466-1, Tr. 1201].  As argued by the Trustee and the Debtors, the liability of the Stewarts and the non-debtor affiliates to Kirkpatrick Bank assured this insolvency. The Trustee testified that if the settlement was not approved litigation would continue with the consequent depletion of estate assets.  Kirkpatrick Bank would probably foreclose on its collateral (including Raven, Oklamiss and Shimmering Sands), and he would attempt to sell the Stewarts' non-exempt property.  According to the Trustee, this scenario would make available for distribution to unsecured creditors somewhere between $300,000 and $400,000. [Doc 545, Tr. 1277].  If the settlement were to be approved there would be in the estate approximately $1.3 million, and after administrative expenses there would be available for distribution to unsecured creditors approximately $1 million. [Doc. 545, Tr. 1275-1277].  In his opinion $750,000 was a "reasonable return to the estate for all the membership interests and other assets that have been abandoned pursuant to the settlement." [466-4, Tr. 1171].

In reaching this conclusion, the Trustee considered, among other things, the testimony and exhibits of the Stewarts' expert witness, J. P. Dick of Pinnacle Engineering. Dick testified that the total value of all oil and gas assets of Raven was $3,480,920. [Doc 466-1, Tr. 1187; Movant Ex. 45]. The Trustee then deducted the secured debt owed Kirkpatrick Bank (including the Interbank debt which had been assigned to it) and the $3.5 million judgment of Legacy Reserves (also assigned to Kirkpatrick Bank ).  That left Raven

with a negative equity of between $5 and $6 million. [Doc 466-4, Tr. 1205].[25]

Another major asset of the Stewarts is Oklamiss which, in addition to being the majority owner of Raven, owns commercial real estate in Indiana.  The Trustee testified that he reviewed numerous appraisals and information from the bank regarding the amount of debt, the collateral, and the value of that collateral and determined that there is no equity in Oklamiss whatsoever. [Doc. 545, Tr. 1243].  The secured debt owed to Kirkpatrick Bank by Oklamiss, either as a primary obligor or as a guarantor, is approximately $11 million. [Doc. 466-3, Tr. 823-824].  The Court finds that there is clearly no equity in Oklamiss that could inure to the benefit of the Stewart estates.

SEPH presented evidence which it claims demonstrated that there was, in fact, substantial equity in Raven which far exceeded the $600,000 which the Trustee was attributing to equity of the non-debtor affiliates under the terms of the settlement.  SEPH's evidence came primarily through the testimony and exhibits prepared by its two expert witnesses, Michael Wiggins ("Wiggins") and David Payne ("Payne").[26]  Wiggins, an expert regarding the valuation of oil and gas reserves, testified that the value of the oil and gas assets owned by the four non-debtor affiliates (Raven, Oklamiss, NOG and OOG ) was $3.887 million. [SEPH Ex. 190], a figure very similar to that of the Debtors' expert.

Payne is a highly regarded expert witness in business appraisal and forensic

---

[25] The Trustee later testified that, "Raven is insolvent at least in the amount of $3 million, maybe as high as $6 million." [Doc 545, Tr. 1244].

[26] While the Court is mainly discussing Mr. Payne's testimony and opinion as regards the valuation of the Stewart estates and the non-debtor affiliates, he also was retained to value the other miscellaneous assets of the estates (personal property), examine the books and records, analyze the management and conduct of the affiliates pre-petition, during the gap period and post-petition, and assess the compromise and settlement proposed by the Trustee. [Doc. 559, Tr. 1923].

accounting by this, and many other, courts. Payne's testimony took 2½ days and consumed 565 pages of transcript. [Docs. 559 & 567, Tr. 1905-2570]. His expert report with supporting documents was 905 pages in length. [SEPH Ex. 192]. Payne concluded that the fair market value of Raven's assets was $9.6 million, with an orderly liquidation value of $8.186 million [Doc. 559-1, Tr. 2083; Trial Aid 16-B]; liabilities (face value without discount) of $13.863 million, with a resulting fair market net asset value of a negative $4.258 million and an orderly liquidation value of a negative $5.677 million. [Doc. 559-1, Tr. 2087; Trial Aid 16-A]. However, Payne then discounted Raven's liabilities by what he deemed a "settlement value" which he regarded as the amount of value (discount or compromise) that an independent party or fiduciary should expect what a borrower or insolvent debtor should be able to obtain when its assets are being used to pay off, compromise or resolve a claim. [Doc. 559-1, Tr. 2091-92 , 2094]. This "settlement value" Payne placed at $8.024 million.

This elimination of $8 million in liability to Kirkpatrick Bank  resulted in Raven's fair market net value of assets for equity of $3.766 million and a net orderly liquidation value for equity of $2.347 million. In essence, Payne was saying that if the Trustee, by persuasion or litigation, could get Kirkpatrick Bank to take a $8 million "haircut" on its claim there would be between $2.3 and $3.7 million in equity for the unsecured creditors of Raven.  Without this "settlement value" adjustment, Payne's valuation of Raven's assets results in a negative equity and is approximately the same as the Trustee's estimation of their value.  When the non-debtor affiliates (including Raven, Oklamiss, NOG, LLC, and Shimmering Sands) are combined as if substantive consolidation had occurred, the consolidated fair market value would be $4.384 million, and the consolidated orderly

liquidation value would be $3.32 million. [Doc. 559-1, Tr. 2125; Trial Aid 15]. When all of the assets and liabilities of all entities, are combined, Payne testified that the net fair market value of equity for distribution to unsecured creditors would be $4.936 million, with an orderly liquidation for equity of $2.253 million. [Doc. 559-1, Tr. 2127; Trial Aid 16-A]. Again, in arriving at these figures Payne deducted the $8 million liability by which he believed the Kirkpatrick Bank debt could be compromised. Lastly, when the value of the affiliates were combined with the assets of the Stewarts, Payne placed a grand total value of $6.401 million. [Doc. 559-1, Tr. 2137].[27] This valuation does not include liabilities and the settlement adjustment to those liabilities. In all probability, there may be some discount that Kirkpatrick Bank would be willing to absorb to get out of the present financial dilemma in which it appears to be, but $8 million is not in this Court's view a realistic figure. Eight million dollars ($8 million) is more than 60% of the debt owed to Kirkpatrick Bank. The Court finds discounting Kirkpatrick Bank's debt by $8 million is too speculative upon which to determine the fate of this proposed settlement.[28]

There is also an aspect of Payne's valuation with which the Court has some concern. Payne testified that the total value of Raven's leasehold interests, without any adjustment for sales or his 30% discount for possible discrepancies, was $7.154 million

---

[27] When Payne included the value of Raven as part of the evaluation of the total Stewart Estate, which included all the non-debtor affiliates, he placed the value of Raven at $2.090 million, not upon fair market or liquidation value, but based upon the amount of distributions paid by Raven post-petition. [Doc. 559-1, Tr. 2090; Tr. 2144; Trial Aid 7].

[28] Payne also included additional assets, or different values than what the Trustee utilized. For example, Payne included in Raven's assets $694,000 in "managerial rights/asset control premium", and increased the value of the non-exempt residential lot owned by the Stewarts from the Trustee's $100,000 to $150,000. Whatever the validity of these valuations, they are not outcome determinative as is the $8 million settlement value discount.

[Trial Aid 30]. In rebuttal, the Trustee's/Stewarts' expert, J.P. Dick, testified that he had reviewed Payne's findings and determined that Raven was no longer the owner of approximately $3.8 million worth of the leaseholds included by Payne. [Doc. 567, Tr. 2585].[29] In Payne's cross-examination by Stewart's counsel, while *all* the allegedly erroneously included leasehold interests were not addressed it was clear to the Court that many leasehold interests should not have been included in Payne's valuation. Payne responded by testifying that he had already given an approximately $1.4 million discount for such possible circumstances, but the Court believes based upon the evidence that it is likely that Payne overstated Raven leaseholds by a far greater figure for which he had made an allowance. Payne also testified that any interests erroneously included in his evaluation was the result of the Stewarts' records either being incomplete or otherwise not made available to him.

Finally, Payne testified that the adversary actions to recover post-petition dividends paid to the Stewarts, or for their benefit to Kirkpatrick Bank, from Raven and from the settlement of Neverve and Shimmering Sands British Petroleum tort settlements, were valued at approximately $2.5 million with a probability of success of 85%, less costs of prosecution, resulting in a recovery for the estate in the range of $2.2- $5.5 million. [Doc. 559-1, Tr. 2171, 2175]. This was Payne's valuation of what the Stewart estates might be entitled to recover in the event of successful litigation. It is not indicative, however, of what might actually be available to recover from the Stewarts (or their consolidated affiliates) in

---

[29] Stewarts' counsel also attempted to utilize a Trial Aid to support Dick's testimony that several wells evaluated by Payne had been previously shut in, plugged or were otherwise inactive. The Court refused to permit use of the Trial Aid because it had not been previously made available to opposing counsel. [Doc. 567, Tr. 2589-2592].

the event of such success. As discussed above, the credible evidence before the Court is that even if all the non-debtor entities were combined (consolidated) with the Stewart estates, there would still be no equity from which the unsecured creditors could derive a benefit. To get to that point, the secured claims of Kirkpatrick Bank would have to be compromised or defeated by at least $5 million. Here, like in most litigation, winning without recovery is a Pyrrhic victory. This *Kopexa Factor* militates strongly in favor of the approval of the settlement.

### F. Integrity of the Bankruptcy System.

From the inception of this case the Court has been concerned with the Stewarts' conduct, both pre-and post-petition. As evidenced by the pending fraudulent conveyance adversary, the issue of David Stewart attempting to engage in pre-bankruptcy planning to put his assets beyond the reach of creditors by transferring them to family members or other entities controlled by him has placed his honesty in question. Further questions were raised with this Court when Stewart testified at the hearing on the Motion to Abandon that certain of Raven's oil and gas properties, which were at that point in time unencumbered, were of little value only for the Court to later learn that approximately seven of those properties had been sold for $3.9 million. The questionable conduct continued with Raven, acting through Stewart, agreeing to a consent judgment in favor of Kirkpatrick Bank possibly in violation of this Court's January 5, 2017, Preliminary Injunction. Further issues have been raised by Stewart and his counsel's lack of candor with regard to the $348,000 payment of attorney's fees without having disclosed the same to the Court.[30]

---

[30] The matter of the undisclosed attorney fees was the subject of the Court's *Memorandum Opinion and Order For Disgorgement of Fees,* in which the Court sanctioned Debtors' counsel for

SEPH argues that this Court's approval of the settlement with its consequent release of Stewart, his affiliates and family members from certain liabilities would bestow a "blessing" upon him for his misconduct. The Court can understand such an argument, but does not believe it to be true. The extraordinary relief afforded by the Bankruptcy Code is intended to be available only to the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654 (1991); *In re Kallstrom*, 298 B.R. 753, 758 (10th Cir. BAP 2003) ("Restricting the issuance of discharged honest debtors is important to the legitimacy and integrity of the bankruptcy process."); *In re Taylor*, 190 B.R. 413, 416 (Bankr. D. Colo. 1995). If a debtor has acted dishonestly or otherwise abused the system, the appropriate remedy is to deny him the major benefit and ultimate goal of bankruptcy–a discharge, pursuant to § 727. Section "727(a) is directed toward protecting the integrity of the bankruptcy system by denying discharge to debtors who engaged in objectionable conduct that is of a magnitude and effect broader and more pervasive than a fraud on ... a single creditor." *In re Chalasani*, 92 F.3d 1300, 1311 (2nd Cir. 1996). Accordingly, many courts hold that § 727 claims may never be compromised. *In re Vickers*, 176 B.R. 287, 290 (Bankr. N.D. Ga. 1994) ("It is against public policy to sell discharges ... Selling discharges would be a disease that would attack the heart of the bankruptcy process, its integrity."); *In re Rotert,* 530 B.R. 791, 799 (Bankr. N.D. Okla. 2015) ("The legitimacy and integrity of the process requires that the § 727 discharge, a right created by Congress and adjudicated and granted by the federal courts, not be treated as a commodity... (and) is not a proper

---

failure to make all required disclosures. [Doc. 576]. SEPH appealed the Court's ruling to the BAP for the 10th Circuit. [W0 -18-068]. On June 4, 2019 the BAP affirmed the Court's decision. SEPH has appealed to the 10th Cir. Court of Appeals.

subject for negotiation and exchange of a *quid pro quo*...").

If the pending adversary proceeding to deny the Stewarts a discharge had been part of the settlement agreement under consideration, this Court would not approve the settlement. Dischargeability is the proper vehicle to decide whether the Stewarts' misconduct has consequences, and by the terms of the settlement the dischargeability adversary will continue notwithstanding any settlement. The Court does not believe it appropriate to not approve a settlement which is in the best interests of creditors and meeting the *Kopexa Factors* based on a debtor's bad-faith conduct. See *Law v. Siegel*, 571 U.S. 415, 134 S.Ct. 1188 (2014). Knowing that there is preserved an appropriate remedy for any misconduct impugning the integrity of the bankruptcy system, this Court should focus on what is best for the creditors and the bankruptcy estate under the remaining *Kopexa* standards. Considering the *Kopexa* standards, the Court finds that the Trustee, exercising his sound business judgment, has proposed a settlement which cannot be said to fall below the lowest point in the range of reasonableness.

## Conclusion

For the reasons set forth above, the *Second Joint Motion to Approve Compromise and Settlement Agreement* filed by the Debtors and the Trustee [Doc. 472] is hereby **Granted** and the Settlement Agreement **Approved.**

**# # #**