**Dated: May 27, 2025**

**The following is ORDERED:**





Janice D. Loyd
U.S. Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| David A. Stewart, | ) | Case No. 15-12215-JDL |
| Terry P. Stewart | ) | Ch. 7 |
| | ) | Jointly Administered |
| Debtors. | ) | |

**OPINION AND ORDER ON DISGORGEMENT OF ATTORNEY FEES**

**I. Introduction**

After a three day trial, before the Court for decision is the motion of creditor Southeast Property Holdings, LLC ("SEPH") seeking an order requiring Debtors' attorney, Ruston C. Welch and the Welch Law Firm (individually and collectively referred to as "Welch"), to disgorge approximately $525,000 in attorney fees due to Welch's failure to make proper disclosure of the fees as required by 11 U.S.C. § 329 and Federal Rules of Bankruptcy Procedure 2016 and 2017.[1] As the trial and decision of this disgorgement

---

[1] All further references to "Code," "Section," and "§" are to the United States Bankruptcy Code, Title 11 U.S.C. §101 et seq., unless otherwise indicated. All future references to "Rule" or "Rules" are to the Federal Rules of Bankruptcy Procedure, unless otherwise indicated.

matter is before this Court on the reversal and remand with instructions by the Tenth Circuit Court of Appeals, the Court believes an introductory procedural history is necessary to provide context for the issues now before the Court.

## II. Background and Posture of the Case

For more than two years after being retained by the Debtors in the spring of 2015 to represent them in this bankruptcy case, numerous adversary proceedings associated with it, as well as representing numerous affiliates owned or operated by Debtors, Welch failed to disclose the amount, source or agreement for the payment of any attorney fees to him as required by Bankruptcy Code § 329 and Rule 2016. It was not until an *in camera* hearing on August 30, 2017, when the Court ordered him to do so, that Welch revealed that he had been paid $348,404.41 in fees and expenses for the bankruptcy case and related adversaries. The source of all of these payments was proceeds of the settlement of tort claims by several of Debtors' affiliates against British Petroleum arising out of the April 2010 Deepwater Horizon oil spill in the Gulf of Mexico.

In June 2016, while this bankruptcy case was pending, Stewart had signed settlement agreements with British Petroleum on behalf of five Stewart-owned affiliates. Unbeknownst to the Court and creditors, Welch had entered into a contingency fee agreements giving him approximately 15% of all proceeds recovered from BP by the five Stewart related affiliates. On August 3, 2016, Welch received the proceeds of the settlement of the BP claims and applied his contingency fee proceeds to pay himself for the services which he had rendered in the Stewart bankruptcy matters.

In 2017 SEPH moved the Court to order Welch to disgorge approximately $350,000.00 in attorney fees which he had been paid for his bankruptcy services as of

2

September 1, 2017, as well as any future fees he would be paid in the case. Disgorgement was sought by virtue of Welch not having made proper disclosure of his fees as required by Bankruptcy Code §§ 329 and 330 and Rules 2016 and 2017.  In April 2018, this Court, based upon the parties' extensive briefs addressing the disgorgement issue, but without conducting an evidentiary hearing, ordered Welch to disgorge $25,000.00 of his fee.[2] SEPH appealed the Court's decision, and the Bankruptcy Appellate Panel affirmed this Court's order.[3]  The Tenth Circuit Court of Appeals reversed, and remanded the case back to this Court for an evidentiary hearing consistent with its ruling.[4]

In reversing this Court's disgorgement ruling, the Tenth Circuit found that the presumptive or "default" position for failure of an attorney to make proper disclosure under § 329 and Rule 2016 was disgorgement of *all* fees paid to the attorney unless there were "sound reasons supported by solid evidence" in mitigation of total disgorgement. *Stewart*, 970 F.3d at 1268. (Emphasis added).  The Court of Appeals found that the Bankruptcy Court had not heard such "solid evidence," "[m]ost importantly, however, the bankruptcy court failed to examine the source of the payments to Mr. Welch **** [and] [w]e would therefore expect the court to examine those payments before deciding not to require complete disgorgement." *In re Stewart,* 970 F.3d 1255, 1268 (10th Cir. 2020).  The Tenth Circuit instructed that upon remand this Court should, upon an evidentiary basis, closely examine all payments to Welch, including the amount, *source* and value of the same to

---

[2] *In re Stewart,* 583 B.R. 775 (Bankr. W.D. Okla. 2018).

[3] *SE Property Holdings, LLC v. Stewart et al. (In re Stewart)*, 600 B.R. 425 (10th Cir. BAP 2019).

[4] *SE Property Holdings, LLC  v. Stewart et al. (In re Stewart)*, 970 F.3d 1255 (10th Cir. 2020).

3

determine the appropriate amount of disgorgement this Court should order. (Emphasis added).

The Tenth Circuit Opinion also noted that SEPH, in addition to the non-disclosure of the fees, argued that Welch's use of settlement proceeds paid to one of the Stewart affiliates, Neverve LLC, was improper because (1) SEPH held a security interest in any BP proceeds that might be awarded to Neverve and/or (2) such proceeds were dividends to the Debtors and therefor property of the bankruptcy estate. While the Tenth Circuit made "no judgment on the validity of [SEPH's] challenges to these payments to Mr. Welch," it found that "[e]ven if they [the challenges] fail, they may have caused sufficient concern to induce him [Welch] to avoid the challenges by keeping the payments secret." *Id*. at 1269. Furthermore, the Opinion noted that while the Bankruptcy Court "seems to have inferred ... [that] Mr. Welch's ... failures to disclose must have been inadvertent ... an alternative hypothesis is that he surely knew of his duty and must have had some very strong reason to keep the payments secret." *Id*. at 1268. Of particular importance to the disgorgement issue, the Opinion found that the Bankruptcy Court had assumed facts "not in evidence and, most importantly, apparently assumed good faith without examining the *possible motives for nondisclosure." Id.* at 1258.[5] (Emphasis added).

---

[5] Another "fact" which the Tenth Circuit found this Court had committed error in support of mitigation without evidence was that disgorgement would have a "catastrophic financial" effect upon Welch. Subsequent events would prove that Welch's representation of the Stewarts would indeed be his financial undoing. SEPH brought suits against Welch in the federal district courts in Florida and Alabama. Those cases were dismissed for lack of jurisdiction. SEPH then filed suit against Welch in the United States District Court for the Western District of Oklahoma for claims of fraud, conversion, civil conspiracy, unjust enrichment, constructive trust and for an inequitable lien all arising out Welch's payment of his attorney's fees with the Neverve BP claims proceeds. *SE Property Holdings, LLC, Plaintiff v. Ruston C Welch and Welch Law Firm, P.C.,Defendants*, No. CIV-19-852-R. (W.D. Okla. filed Sept. 13, 2019) [Welch Ex. 81]. Just prior to trial, Welch and his law firm filed Chapter 7 bankruptcy. *In re Welch Law Firm, P.C.*, No 21-12415 (Bankr. W.D. Okla 2021) [Welch Ex. 82]; *In re Welch*, No. 21-12416 (Bankr. W.D. Okla. 2021) [Welch Ex. 85].

In accordance with the mandate and instructions of the Tenth Circuit, and after allowing the parties several months of discovery on the issue, the Court conducted a three day evidentiary hearing (comprising approximately 700 pages of transcript) upon the following pleadings, including the one hundred twenty-one (121) page *Final Pre-Trial Order* formulating the issues and evidence for the disgorgement hearing:

(1) *SE Property Holdings, LLC'S Motion for Disgorgement of Compensation Paid to Welch Law Firm P.C., Denial of Unpaid Compensation and Reimbursement of Property of the Estate Transferred to Third Parties, Pursuant to 11 U.S.C. § 329(a) and Fed. R. Bankr. P. 2016, 2017, and 9014* (the "*Motion*") [Doc. 852] filed on October 20, 2017;

(2) *Response of Ruston C. Welch and Welch Law Firm P.C. ("Welch") to SE Property Holdings, LLC's ("Seph") Motion for Disgorgement* (the "*Response*") [Doc. 973] filed on December 4, 2017;

(3) *SE Property Holdings, LLC'S Reply to Ruston C. Welch and Welch Law Firm's, P.C. Response to Motion for Disgorgement* (the "*Reply*") [Doc. 974] filed on December 18, 2017; [6]

(4) *Kirkpatrick Bank's Response to SEPH's Motion to Disgorge* [Doc. 971] filed on November 3, 2017;

---

SEPH filed an adversary proceeding in Welch's bankruptcy case seeking to determine his alleged debt to SEPH arising out of Welch's use of the Neverve BP claim proceeds be determined non-dischargeable under § 523(a)(2)(fraud), (4) (breach of fiduciary duty), (6) (willful and malicious injury to property) and (7) (forfeiture). *SE Property Holdings, LLC, Plaintiff v. Ruston C Welch, Defendant,* Adv. No. 21-1075. The Bankruptcy Court lifted the automatic stay in Welch's bankruptcy to let this disgorgement matter proceed. [*In re Welch*, No 21-12416-SAH, Doc. 60].

[6] The *Motion*, *Response* and *Replies* now under consideration by the Court were originally filed "under seal" [Docs. 488, 499, 508 and 519] out of concern that certain facts relating to the funds received by and fees paid to Welch were subject to the Confidentiality Order entered by the United States District Court for the Eastern District of Louisiana relating to settlement of environmental tort claims arising out of the British Petroleum Deepwater Horizon oil spill in the Gulf of Mexico in April 2010 (the "BP claims"). Much of the concern for confidentiality was waived by Welch's filing of his *Amended Disclosure of Compensation of Attorney for Debtor* on September 20, 2017, which set forth in detail the funds received pursuant to settlement of the BP claims [Doc. 464]. As a consequence, the Court entered its *Order Unsealing Pleadings and Directing Clerk to file Pleadings* on March 27, 2018 [Doc. 570]. When the documents were unsealed, the Court Clerk filed them for public access on the dates they were filed under seal as set forth above.

5

(5) *SE Property Holdings, LLC'S  Reply to Kirkpatrick Bank's Response to Motion for Disgorgement* [Doc. 972] filed on November 9, 2017;

(6) *Final PreTrial Order* [Doc. 937] filed July 15, 2022;

(7) *Closing Statement on Behalf of the Welch Parties* [Doc. 998] filed May 2, 2023;

(8) *SEPH's Written Closing Statement* [Doc. 999] filed May 2, 2023.

### III. Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334, 157(a) and the Order of Reference issued by the United States District Court for the Western District of Oklahoma as Local Rule LcvR 81.4(a). In accordance with Rules 7008 and 7012, both SEPH and Welch have consented to final orders or judgment by the bankruptcy court. Venue is proper pursuant to 28 U.S.C. § 1409. This contested matter is procedurally governed by Rule 9014.  The statutory predicate lies in 11 U.S.C. § 329(a).  This is a core proceeding arising under 28 U.S.C. § 157(a)(2)(A), (B) and (O).  The following constitute Findings of Fact and Conclusions of Law supporting the Court's decision as required to be made by the Court pursuant to Rules 7052 and 9014.[7]

### IV. Findings of Fact

The evidentiary hearing conducted by the Court on March 14-16, 2023, included three live witnesses,[8] five witnesses by deposition,[9] and more than 100 exhibits consisting of several thousand pages. In accordance with the Court's instructions, following

---

[7] The below enumerated "facts" are not exclusive. There are additional facts embedded in the Court's "Discussion" section of this Opinion and to the extent the "Discussion" or "Conclusions of Law" section contain any items that should more appropriately be considered "Findings of Fact," they are incorporated herein by reference.

[8] Ruston C. Welch, Trustee Douglas N. Gould and David A. Stewart.

[9] Bill Barranco, Troy Martin, Von Memory, Jennifer Corbitt and Broox Holmes.

preparation of the trial transcript the parties submitted written closing arguments. Based upon the evidence the Court made the following findings of fact:

1. Neverve, LLC ("Neverve") is a limited liability company organized pursuant to the laws of the State of Florida. At all times material hereto, David Stewart was a member/manager of Neverve.

2. Beginning in 2004, SEPH's predecessor in interest, Vision Bank, began loaning millions of dollars to Neverve. To secure the loans, Neverve granted Vision Bank a mortgage and security interest in real property located in Florida. When David Stewart became a member of Neverve, he (and later his wife, Terry Stewart) personally guaranteed all indebtedness of Neverve to Vision Bank.

3. After Neverve's default on the Vision Bank loans which it had acquired, SEPH foreclosed on the real property, and on May 1, 2013, obtained a *Final Judgment of Foreclosure* in the amount of $22,791,342.02.[10]

4. On June 18, 2015, the United States District Court for the Northern District of Florida issued a deficiency Judgment in favor of SEPH against Neverve for a total sum of $19,661,891.08.[11]  The Judgment has not been satisfied.

5. Based upon their personal guaranty of the Vision Bank loans to Neverve, on May 19, 2014, SEPH sought and received summary judgment against the Stewarts individually in the United States District Court for the Southern District of Alabama.**[12]**

---

[10] *SE Property Holdings, LLC v. Neverve, LLC*, No. 5:12-cv-292-RS-CJK (N.D. Fla. May 1, 2013) [Seph Ex. 6].

[11] *SE Property Holdings, LLC v. Neverve, LLC*, No. 5:12cv292-RH/CJK (N.D. Fla. June, 18, 2015) [Seph Ex. 1].

[12] *SE Property Holdings, LLC v. David A. Stewart, et al.*, No. 1:12-cv-00537-CB-M. (N.D. Fla. May 19, 2014).

6. In addition to loaning money to Neverve, Vision Bank loaned millions of dollars to other entities in which Stewart was an owner or principal. These other entities included ZLM Acquisitions, LLC ("ZLM") and Zeke's Landing Marina, LLC ("Marina"), whose debts to Vision Bank David Stewart personally guaranteed.

7. On June 23, 2011, Stewart as manager of ZLM and Marina, and as a guarantor of those entities, executed in favor of Vision Bank a *Second Supplement to Loan Documents* (the "*Second Supplement*") which in consideration of Vision Bank's extension of loans, among other things, granted Vision Bank a security interest in claims held by certain of Vision Bank's debtors, including Stewart affiliates, against British Petroleum (BP) for damages incurred by them rising out of the April 2010 Deepwater Horizon oil spill in the Gulf of Mexico.[13]

8. This case was commenced by SEPH's filing of Involuntary Petitions under Chapter 7 for both David A. Stewart and Terry Stewart in the United States Bankruptcy Court for the Southern District of Alabama on September 30, 2014. After several months of litigation related to the allegations in SEPH's Involuntary Petitions in which Debtors were represented by Alabama counsel, on March 18, 2015, the Bankruptcy Court entered Orders for Relief.[14] On May 1, 2015, Debtors filed their *Schedules, Statement of Financial Affairs, Statement of Intent and Disclosure of Compensation of Attorney for Debtor* in the Alabama Bankruptcy Court. Bankruptcy Form 2016(b), *Disclosure of Compensation of*

---

[13] The terms of the *Second Supplement* are a significant issue in this litigation and will be addressed in greater detail below in this Opinion.

[14] The cases of Debtors David A. Stewart (Case No. 15-12215) and Terry P. Stewart (Case No. 15-12216) have been administratively consolidated. Unless otherwise indicated, all "Doc." Numbers are to Case No. 15-12215.

*Attorney for Debtor,* indicated that the Debtors' attorneys, Allen C. Christian and E. Russell March, III had undertaken representation at hourly rates of $325 and $275 per hour, respectively, and received a retainer of $24,829.20 [Doc. 89, pgs. 47-48].[15]

9. On June 12, 2015, the Alabama Bankruptcy Court entered its *Order Granting Debtors' Motions to Change Venue* transferring the cases to the United States Bankruptcy Court for the Western District of Oklahoma.

10. On the same day that the Alabama Bankruptcy Court entered its order transferring the case to Oklahoma, Debtor David A. Stewart contacted Welch to set up a meeting to discuss representation. On June 15, 2015, Welch agreed to represent the Debtors in their pending Chapter 7 cases. On June 17, 2015 (effective May 12, 2015), a Representation Agreement was executed between Debtors and Welch which included services for general representation, debt counseling, corporate-structure and bankruptcy representation for the Debtors and certain named business affiliates. On the same date, Welch filed his Notice of Appearance in the bankruptcy case.

11. Although Welch was required to disclose the source of his compensation in the bankruptcy proceeding pursuant to § 329(a) and Rule 2016(b), it is not disputed that Welch never filed a Rule 2016(b) *Disclosure of Compensation of Attorney for Debtor* from the time

---

[15] In addition to the separate *Disclosure of Compensation of Attorney for Debtor*, ¶ 9 of the Statement of Financial Statement Affairs requires disclosure of "payments related to debt counseling or bankruptcy." The Statement of Financial Affairs filed in the Alabama Bankruptcy Court checked "None" as to any such payments. [Doc. 89, pg. 36]. In the case of an involuntary bankruptcy "none" might be the correct answer given the fact that the disclosures required are payments "made within one year *immediately preceding* the commencement of this case." (Emphasis added). It is unlikely that a putative debtor would have retained bankruptcy counsel before the involuntary petition was filed. Similarly, when Welch filed an *Amended Statement of Financial Affairs* on September 29, 2015, he checked the box "None" indicating that no payments had been made to him in the one year preceding the filing of the petition. [Doc. 196-1, pg. 5]. The evidence shows that to be a true statement.

he undertook representation of the Debtors in June 2015 until the Court ordered him to make immediate disclosure of his fees at an *in camera* proceeding on August 30, 2017, during a hearing on the Debtors' and the Trustee's *Joint Motion to Approve Compromise and Settlement* of various adversary proceedings against the Debtors.

12. The first of the required *Disclosure of Compensation of Attorney for Debtor* was filed by Welch on September 14, 2017.[16]

13. In January 2013 Neverve and Shimmering Sands, of which David Stewart was a member/manager, filed "opt-out" claims for damages allegedly incurred by those affilates as a result of the BP Deepwater Horizon oil spill. [Welch Ex. 56]. Neverve and Shimmering Sands retained an Alabama law firm, Taylor Martino P.C. ("Taylor Martino") to prosecute their BP claims on what David Stewart believed was a 25% contingency fee basis.[17]

14. On April 13, 2015, the Claims Administrator for the Deepwater Horizon Damages Settlement Program gave *Notice of Enforced Third Party Claim* to Neverve advising it that SEPH had filed a claim with the Administrator in the amount of $22,791,342.01, identifying Neverve as the claimant. Welch became aware of this *Notice*

---

[16] While the first formal *Disclosure of Compensation of Attorney for Debtor* was filed on September 14, 2016, on September 1, 2016, the day after the *in camera* hearing in which the Court had ordered Welch to disclose his fees, Welch had hand-delivered to the Court numerous documents relating to the payment of his fees. On September 8, 2016, Welch delivered to the Court for its *in camera* review a cover letter together with 290 pages of documents relating to the BP settlement and the funds Welch had received. [Tr. pg. 91].

[17] As will be discussed herein, there was confusion as to what the actual contingency fee was. No written fee agreement appears to have been executed between the Stewart affiliates, including Neverve, and Taylor Martino until May 2016 when settlement of Neverve's BP claim was imminent. David Stewart testified that while he wasn't sure, he thought the original contingency fee was 20 or 25%. As will be discussed, whatever the original fee agreement was it was modified to 40% in the spring of 2016 when Welch entered into a BP claims "fee-sharing" agreement with Taylor Martino.

*of Enforced Third Party Claim* by SEPH some time after being retained by the Stewarts for their bankruptcy. [SEPH Ex. 97].

15. By an email on August 21, 2015, from Welch to the Bankruptcy Trustee, Doug Gould, Welch attached a copy of SEPH's *Notice of Enforced Third Party Claim* and questioned "whether the notice is an (sic) means to perfect the judgment lien or if the judgment lien can be perfected in a litigation claim." [Welch Ex. 26].

16. On or about January 18, 2016, backdated to June 17, 2015, Welch entered into a Representation Agreement by which several Stewart Related Entities ("Affiliates"), including Neverve, guaranteed Welch's attorney fees for the Stewart bankruptcies. [Welch Ex. 8; Tr. pg. 78].

17. On January 13, 2016, the United States District Court for the Eastern District of Louisiana in the BP oil spill Multi–District Litigation entered a *Confidentiality Order* which, in pertinent part, provided that any party:

> "shall treat as strictly confidential all documentation, draft or otherwise, of all terms sheets, release agreements, or other settlement-related documentation, and all communications regarding resolution of claims or lawsuits related to this multi-district litigation (including both the fact and substance of any discussions and any document prepared in connection therewith). Any person who has been shown any such documents and/or included in communications shall be bound to keep such information as private and disclosed to no one unless specifically permitted **in advance** by the undersigned."[18]

(Emphasis in original). [Welch Ex. 10]. Welch testified that he did not see a copy of the *Confidentiality Order* until July 2017. [Tr. pgs.178-179]. He sent a copy the *Confidentiality*

---

[18] *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* MDL No. 2179 (E.D. La., Document 15718 *SEALED*, Jan. 13, 2016).

*Order* to the Trustee on August 27, 2017. [Welch Ex. 32].

18. After years of little significant activity with regard to the Neverve and Shimmering Sands BP claims, on March 18, 2016 Welch became aware that Taylor Martino had entered into confidential settlement discussions regarding the BP claims. [Tr. pg. 171]. In May 2016, Taylor Martino prepared Employment Contracts with several Stewart affiliates, including Neverve and Shimmering Sands, by which Taylor Martino was to receive a 40% contingent fee for any recovery of BP oil spill claims. The Employment Contracts with Taylor Martino were signed by Stewart on May 17, 2016, but were backdated to April 19, 2016. [Welch Ex. 11; Tr. pgs. 156-157].

19. On June 3, 2016, but backdated to April 19, 2016, Welch and Taylor Martino entered into a Fee Sharing Arrangement for Employment Contracts by which Welch received a fee sharing amount equal to 15% of total amount recovered for each of the BP claims, less one-third for the payment of referral fees to another attorney. [Tr. pgs. 159-161, 434]. The 40% total attorney fees were therefor to be divided as follows: Taylor Martino 52.08%; Welch Law firm 32.29% and a referring attorney 15.625%. [Welch Ex. 13].

20. On June 6, 2016, Stewart, on behalf of four of his affiliates, including Neverve and Shimmering Sands, executed releases of BP claims by which Neverve was to be paid $490,393 and Shimmering Sands $310,000. [SEPH Ex. 249 and 251].

21. On August 3, 2016, Welch received from Taylor Martino a wire transfer for $144,591.85 representing Welch's BP claims contingency attorney fees for representing the Stewart related entities of Neverve, Shimmering Sands, S&S, LLC, and Zeke's Lady, LLC. This sum was applied to the then outstanding hourly-rate fees and expenses incurred for Welch's representation of the Debtors in their bankruptcy, other defendants in related

12

adversary proceedings and representation of the Stewarts and/or affiliates in non-bankruptcy matters. The portion of the contingency fees attributable to Welch's representation of Neverve, which was applied to the bankruptcy fees, was $73,638.45. [Welch Ex. 15, Doc. 464, pg. 4].

22. Also on August 3, 2016, Welch's IOLTA trust account received a second wire transfer from Taylor Martino in the amount $528,394.39, representing Welch's clients' net shares (which did not include the contingent attorney fee to be paid Welch) available for distribution to the four Stewart affiliates Welch was representing. Neverve's share of the net proceeds was $275,572.27, of which between August 2016 and October 2017 $203,812.56 was applied to the payment of the Debtors' and the affiliates' attorney's fees due Welch in the bankruptcy and adversaries. [Welch Ex. 15, Doc. 464, pg. 4].

23. Welch never filed a Disclosure of Compensation of Attorney for Debtor as required by Rule 2016 from the time he undertook representation of the Debtors (and their thirteen (13) affiliated limited liability companies) in May 2015 until September 14, 2017,[19] prior to which Welch paid himself fees and expenses for the bankruptcy case and adversaries a total of $348,404.41. [Welch Ex. 15, Doc. 464, pg. 3].

24. At the *in camera* proceeding on August 30, 2017, when it was first disclosed that Welch had been paid his bankruptcy fees with the BP settlement proceeds, the Court ordered Welch to immediately file his Rule 2016 attorney fees disclosures. On September 14, 2017, Welch filed his first Disclosure of Compensation of Attorney for Debtor which set forth Welch's hourly rate, the total fees incurred and paid of $348,404.41, the fees yet

---

[19] But see footnote 16.

13

unpaid and a list of the Debtors' affiliate.  The Disclosure did not indicate a breakdown of the source of the funds which he had used to pay his attorney's fees.

25. On September 20, 2017, Welch filed an Amended Disclosure which provided further detail, including the amount, source and purpose of the funds received, the application of the funds, a calendar breakdown of the funds applied and the amounts and balances remaining for further distribution of certain funds.  For the first time it made the disclosure of settlement proceeds received by Welch on behalf of affiliates of the Debtors for tort claims against British Petroleum arising out of the Deepwater Horizon oil spill in April, 2010.  The Amended Disclosure showed receipt of the BP settlement proceeds via the two wire transfers from Taylor Martino on August 3, 2016; one for the $144,591.85 for Welch's contingency fee and one for $528,394.39 for net settlement proceeds for the benefit of Neverve ($275,572.27) and three other Stewart related entities.

26. On December 4, 2017, Welch filed a three hundred fifty-three (353) page *Supplemental Statement to Amended Disclosure of Compensation of Attorney for Debtors* (the "*Supplement*"). [Doc. 522]. The *Supplement* contained a twenty-one (21) page chronological detail of Counsel's representation of the Debtors and some thirteen (13) Affiliates.  It also disclosed for the first time ten (10)  Representation Agreements with the Debtors and the Affiliates and Welch's April 19, 2016, BP "fee-splitting" agreement with Taylor Martino.

27. From December 4, 2017, to October 18, 2021, Welch filed twenty-five (25) *Supplemental Statements to Amended Disclosure of Compensation of Attorney for Debtors.*  Those supplemental disclosures reflected that (1) from May 3, 2018 to June 30,

14

2018, Welch was paid his attorney's fees with the remaining $70,397.86 from Neverve BP net proceeds, and (2) between April 18, 2018, and May 20, 2020, Welch received $104,450.00 from BP settlement proceeds from Stewart related entities, other than Neverve, which were applied to the fees and expenses the Stewarts had incurred for representation in their bankruptcy and certain non-bankruptcy services provided to them and/or their related entities.  Total attorney's fees that Welch was paid for representation of the Debtors was $523,579.12.

28. On April 27, 2018, this Court entered its *Memorandum Opinion and Order for Disgorgement of Fees* [Doc. 576] directing Welch to disgorge $25,000 of the fees he had been paid for representing the Debtors.  Welch paid the Trustee the $25,000.  Most, if not all, of the $25,000 was from Neverve BP proceeds.

29. On September 28, 2020, the Court sustained Welch's *Motion to Withdraw as Counsel of Record* for the Debtors. [Doc. 768].

## V. Discussion

It is not disputed that Welch never filed a Rule 2016(b) *Disclosure of Compensation of Attorney for Debtor* from the time he undertook representation of the Debtors in June 2015 until the Court ordered him to make disclosure of his fees at the *in camera* proceeding on August 30, 2017. Welch did not file his first required Disclosure of Compensation until September 14, 2017.[20]  During this more than two year time of

---

[20] On September 1, 2017, two days following the Court's *in camera* order, Welch hand-delivered to the Court for its *in camera* review the BP settlement agreements and other documentation regarding's Welch's fees.  On September 8, 2017, Welch delivered to the Court 290 pages of documents regarding the BP claims that the Court had requested in the August 30, 2017, *in camera* hearing. [Tr. pgs. 90-91].

representation, Welch paid himself fees and expenses for the bankruptcy case and the related adversaries a total of $348,404.41. After making proper disclosures to the Court beginning in September 2017, through 2020, Welch was paid an additional approximately $175,000, making his total fees paid of $523,579.12.

Welch admits that the law required him to disclose his fees, and he made a "mistake" in not doing so until ordered by the Court. There is also no doubt, as made clear by the Tenth Circuit, that the full disgorgement of all fees is the "default" sanction for failing to make proper disclosure. The only issue is whether Welch has presented any evidence of mitigating factors justifying other than full disgorgement of all fees paid him.

### A. The Law Applicable to Disgorgement of Attorney Fees.

Resolution of the issues raised in SEPH's *Motion* for disgorgement involve the interplay between Bankruptcy Code § 329 and Rule 2016. This statute and rule work together to provide a framework for the systemic oversight of administrative costs, reasonableness of fees, and any questionable relationships of third-party payors to the debtor and the attorney in bankruptcy cases.

The starting point for analysis is § 329(a), which states:

> Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

Rule 2016(b) provides the following procedure for implementing § 329:

16

(1) *Basic Requirements*. Within 14 days after the order for relief-or at another time as the court orders-ever debtor's attorney (whether or not applying for compensation) must file and sent to the United States trustee the statement required by § 329....

(2) *Supplemental Statement*. Within 14 days after any payment or agreement to pay not previously disclosed, the attorney must file and send to the United States trustee a supplemental statement.

Stated concisely, Rule 2016(b) requires debtor's attorneys to disclose at the outset all fees paid or agreements regarding fees to be paid, and thereafter they must disclose post-petition transactions within fourteen (14) days of receipt. These disclosures enable the Bankruptcy Court to carry out its traditional role of scrutinizing carefully the compensation paid to the debtor's attorney, and "to prevent overreaching by an attorney and provide protection for creditors." *Jensen* v. *United States Trustee (In re Smitty's Truck Stop, Inc.)*, 210 B.R. 844, 848 (10th Cir. BAP 1997); *In re C.W. Mining Co.*, 440 B.R. 878, 885 (Bankr. D. Utah 2010) ("Attorneys representing debtors are required and expected to fully and candidly disclose all of their agreements relating to compensation, the amount of compensation paid or agreed to be paid, and the source of payment.").

The disclosure requirements of § 329 are "mandatory[,] not permissive." *Turner v. Davis, Gillenwater & Lynch (In re Investment Bankers, Inc.)*, 4 F.3d 1556, 1565 (10th Cir. 1993); *In re Smitty's Truck Stop, Inc.*, 210 B.R. at 848. "An attorney is required to 'lay bare all of [his] dealings' concerning compensation agreements, payments, property transfers, etc. all made by, for, or on behalf of the debtor so that the court and parties are not forced to 'ferret out pertinent information.'" *Walton v. Whitcomb (In re Whitcomb)*, 479 B.R. 133, 140 (Bankr. M.D. Fla. 2012) (quoting *In re Saturley*, 131 B.R. 509, 517 (Bankr. D. Me.

17

1991)); *Neben & Starrett, Inc. v. Chartwell Financial Corp. (In re Park-Helena Corp.)*, 63 F.3d 877, 881 (9th Cir. 1995).

The fact that Welch first became involved in the case nearly nine months after it had been filed and after removal from Alabama to Oklahoma is irrelevant. An attorney who was retained to represent a debtor in a case after it has been filed is still required to make a § 329 disclosure. *Mapother & Mapother P.S.C. v. Cooper (In re Downs),* 103 F.3d 472, 477 (6th Cir. 1996); *In re Hackney*, 347 B.R. 432, 442-43 (Bankr. M.D. Fla. 2006) ("Counsel was required to file and transmit to the United States Trustee a Rule 2016 Statement disclosing the terms of his compensation agreement with the Debtors immediately upon substituting in as their counsel.").

The fact that the source of the funds to pay Stewarts' legal fees was from third-party payors (primarily Neverve) rather than from Stewart also did not alter Welch's obligation for proper disclosure of the fees. The language of § 329(a) makes it clear that it requires a debtor's attorney to disclose "*the source of such compensation*." (emphasis added). *See In re The Harris Agency, LLC*, 468 B.R. 702, 707 (Bankr. E.D. Pa. 2010) ("[I]t being settled that 'under section 329 and Bankruptcy Rule 2016(b) [an attorney's disclosure statement] must disclose the source of ... compensation, even if the source is not the debtor but a third party entity.'" (quoting 3 *Collier on Bankruptcy* ¶ 329.03 (15th Ed. 2009)); *In re Frye*, 570 B.R. 21, 31 (Bankr. D. Vt. 2017); *In re Greco,* 246 B.R. 226, 229-30 (Bankr. E.D. Pa. 2000).

Further, it is not relevant that Welch may have represented the Debtors well and performed valuable services on their behalf. While Welch is a talented attorney who has

18

represented the Debtors well in this very acrimonious litigation, the law is clear that the failure to properly disclose compensation received is in and of itself grounds for disgorgement. *See In re Investment Bankers, Inc.*, 4 F.3d at 1565. "Whether or the degree to which the estate sustained harm...[the] focus on appeal—is beside the point." *In re Dordevic*, 62 F.4th 340, 342 (7th Cir. 2023). The fee disclosure obligations are mandatory, not optional. *See Kravit, Gass & Weber, S.C. v. Michel (In re Crivello)*, 134 F.3d 831, 836 (7th Cir. 1998) ("[C]ounsel who fail to disclose timely and completely ... proceed at their own risk because failure to disclose is sufficient grounds to ... deny compensation."). Even if the Court did not question the reasonableness of the pre-disclosure payment of approximately $348,000, or the total amount paid to Welch, "[t]he fact that the fee may or may not have been reasonable or have been earned does not justify a disregard for the rules of disclosure." *In re Woodward*, 229 B.R. 468, 475 (Bankr. N.D. Okla. 1999)

The law is clear that the failure to comply with § 329 and Rule 2016(b) constitutes sufficient grounds, under appropriate circumstances, for the Court to exercise its inherent power and discretion to deny all fees and costs paid to Welch and to direct disgorgement of up to all fees and costs already received. *Smitty's Truck Stop, Inc.,* 210 B.R. at 848 ("[A]n attorney who fails to comply with the disclosure requirements of § 329 and Rule 2016(b) forfeits *any right* to receive compensation for services rendered on behalf of the debtor and may be ordered to return fees already received.") (emphasis added); *In re Investment Bankers*, *Inc*., 4 F.3d at 1565 ([A]n attorney who fails to comply with the requirements of § 329 forfeits any right to receive compensation for services rendered on behalf of the debtor, (citations omitted), and a court may order an attorney *sua sponte* to

disgorge funds already paid to the attorney.") (citations omitted); *Henderson v. Kisseberth (In re Kisseberth)*, 273 F.3d 714, 721 (6th Cir. 2001) ("[B]ankruptcy courts have broad and inherent authority to deny any and all compensation where an attorney fails to satisfy the requirements of the Code and Rules."); *In re Wood*, 408 B.R. 841, 848 (Bankr. D. Kan. 2009).

Many courts adopt a rigid, "zero-tolerance" approach commanding denial of fees and disgorgement where counsel has failed to make proper disclosure under § 329(a) and Rule 2016. *See e.g. Downs,* 103 F.3d at 477; *Kisseberth*, 273 F.3d at 721. However, it is also true that when a bankruptcy court exercises its inherent power to deal with an attorney's noncompliance with disclosure obligations imposed by the Bankruptcy Code and Rules, the court may choose to temper that power with reasonable discretion under the circumstances of the case. *In re Brown,* 371 B.R. 486, 499 (Bankr. N.D. Okla. 2007) ("Disgorgement of fees as a result of inadequate disclosure by counsel is a matter left to the sound discretion of the bankruptcy court."). The imposition of the disgorgement order should be "'commensurate with the egregiousness of the conduct' and will depend on the particular facts of each case." *In re Hackney*, 347 B.R. at 443 (citing *Mapother & Mapother, P.S.C. v. Cooper, (In re Downs)*, 103 F.3d 472, 479-80 (6th Cir. 1996)).[21]

---

[21] *See also In re Howard Avenue Station,* LLC, 568 B.R. 146, 153-54 (Bankr. M.D. Fla. 2017) discussing factors to consider in determining the degree of sanctions for non-disclosure on a case-by-case basis to include, without limitation: (1) the attorney's experience level in the subject area of practice, (2) the attorney's willfulness or recklessness, (3) whether the violation is a mere technical violation, (4) the attorney's level of cooperation with parties in interest to rectify the noncompliance, (5) the reason for the noncompliance, (6) harm to the estate and mitigation of any harm, (7) prior instances of noncompliance and the circumstances surrounding the those circumstances, (8) the promptness of any cure of the subject noncompliance, (9) steps taken by the attorney to prevent similar conduct in the future, (10) the excessiveness of compensation and expenses charged by the attorney and – although alone the means cannot justify the ends – results obtained for the estate.

As the Tenth Circuit found in reversing this Court, "full disgorgement is [not] always appropriate for failure to disclose under § 329, [b]ut it should be the default sanction, and there must be sound reasons for anything less." *Stewart*, 970 F.3d at 1267; *In re Rosales*, 621 B.R. 903 (Bankr. D. Kan. 2020); *In re Andrus*, 2022 WL 1418981 (Bankr. D. Idaho 2022).

It is not disputed by Welch that his failure to disclose the amount and source of his fees and expenses for the bankruptcy and related adversary proceedings for over two years and making such disclosures not by his own volition but only after directed by the Court to do so constitutes a clear violation of § 329 and Rule 2016(b). The question before the Court then is what should be the consequences of such a violation(s). Should the sanction be complete disgorgement of all fees received by Welch for the bankruptcy and related adversaries or based on sound reasons supported by an examination of the solid evidence presented to the court, should the sanction be something less?

### B. Welch's Claim of "Mistake" In Relying on Prior Experience and Bankruptcy Preparation Software in Not Filing Form 2016 Disclosures

Welch testified that the first time he became aware of any possible Rule 2016 disclosure problem was when SEPH's counsel, Richard Gaal, made his opening statement in the Motion to Compromise hearing on August 28, 2017. [Tr. pg. 86]. Welch testified that the reasons for failing to file timely and proper disclosure of his attorney fees were that (1) when he had made previous appropriate Rule 2016(b) disclosures it had been in cases where he had filed the bankruptcy, and the software had printed the appropriate Rule 2016 form as part of the initial filing "package" and (2) in his experience he had not seen

21

supplemental disclosures of attorney's fees filed in Chapter 7 cases.  As testified to by

Welch:

> Q. Was your failure to file a 2016 notice as these payments were done prior to September of 2017 motivated by anything other than your admitted mistake?
>
> A. The initial 2016 was a complete bust and mistake.  I should have filed it.  It would have looked much like the one I did file in October for S&S, but the failure to file the 2016 notices after that when I received payments was my ignorance and not understanding that that triggered another obligation to file a 2016(b) notice.
>
> Again, the -- my history in Chapter 7s and primarily Chapter 11s was that I had never seen a supplemental 2016(b) filed.  There are very prominent law firms and attorneys in Oklahoma City that, the cases I was involved in, I have gone back through Pacer and looked and there were not 2016(b) supplementals filed, even when they received payments on a monthly basis.  And those firms and attorneys, again, are the most prominent attorneys.  So not having seen that, I omitted and didn't understand that I – that triggered a new duty to file a 2016(b) notice.

[Tr. pg. 262].

****

> *** I had prepared two Chapter 11s representing a debtor and the one Chapter 7 representing P&P, and typically that's in my software and you go through the commencement documents and prepare those, and I prepared and filed those with the initial filings.  And again, the -- the disclosure in P&P would have been the mirror of the disclosure for the Stewarts four months earlier.
>
> So, yes, I had previously filed the 2016(b) notices and my lack of experience in the Chapter 7 was assisted in that by the software that generates those forms.

[Tr. pg. 552].

The Court does not view that Welch was asserting a "the software made me do it"

22

defense.   At trial and in depositions, Welch has repeatedly acknowledged *he* made a mistake.   While the software may have been contributing reason, he has not asserted it was a justification for his non-disclosure.   Nor does the Court find the evidence supports SEPH's assertion that Welch's prior experience in making 2016 disclosures and not doing so in this case is evidence of more than mere negligence and is evidence of sinister, intentional misconduct.[22]   The Court understands Welch's explanation of what contributed to his mistaken belief that under the facts and circumstances of this case that initial and supplemental disclosures were not required by Rule 2016(b).   In the Court's experience, both ten years on the bench and 22 years as a Chapter 7 trustee, it is not a common practice in Chapter 7 cases for attorneys to make disclosure for post-petition services rendered. Likewise, the trustee in this case, Doug Gould, testified that "[v]ery seldom have I seen supplemental disclosures in Chapter 7 bankruptcy case." [Tr. pg. 590].   Whatever the common practice may be, the law is that "each time an attorney receives post-petition compensation of any kind from or on behalf of a debtor, a supplemental Rule 2016(b) Compensation Disclosure Statement must be filed." *Stewart,* 970 F.3d at 1258 *(*Rule

---

[22] Welch represented debtors in three prior cases in which he properly made Rule 2016 disclosures, including disclosing that the source of payment of fees was other than the debtor: *Brookshire Place, LLC*, Case No. 11-10717, a Chapter 11 filed in the Western District of Oklahoma; *Southern Oaks of Oklahoma, LLC*, Case No 12-10356 filed in 2012. The Disclosures in both of those cases showed that the fees would be paid by persons or entities other than the debtor. The third case was *P&P Acquisitions, LLC*, Case No. 15-13979. This case involved another of the Stewart affiliates and was filed at the urging of Trustee Doug Gould. The Rule 2016 disclosure in that case shows that the source of the LLC debtor's payment of fees to Welch was by third-parties David and Terry Stewart.

Welch testified the situation with the Stewart bankruptcy was distinguishable from those cases in that the Rule 2016 form disclosure of attorney's fees form in those cases was filled out in connection with an original case filing, and the software generated the forms as part of the original filing.

2016(a) makes the obligation for disclosure required by §329(a) "a continuing one".); *In re Lawson*, 437 B.R. 609, 675 (Bankr. E.D. Tenn. 2010); *In re Dordevic*, 64 F. 4th 340, 342 (7th Cir. 2023) ("Together, these two provisions (§329(a) and Rule 2016(a)) yield a "[p]lain and simple" rule: "attorneys must inform the bankruptcy court of their compensation and promptly update the filing if their fees change.") There is no exception for Chapter 7 cases. *In re Aquilino*, No. 24-1781, slip. op. at 8-9 (3rd Cir. April 24, 2025) (for publication) (in disgorgement proceeding, rejecting debtors' attorney's argument that practice of not disclosing post-petition fees in Chapter 7 cases not violative of § 329 or Rule 2016(b)).

Unfortunately, "negligent or inadvertent omissions 'do not vitiate the failure to disclose.'" *In re Smitty's Truck Stop, Inc*., 210 B.R. at 848 (quoting *In re Park-Helena,* 63 F.3d 877, 881 (9th Cir. 1995); *In re Wright,* 591 B.R. 68, 91 (Bankr. N.D. Okla. 2018) ("Nor does the Court find that a 'pure heart,' without a subjective intent to violate the Code or Rules, provides counsel any defense to the failure to file the proper disclosures under § 329.  Negligent or inadvertent omissions 'do not vitiate the failure to disclose.'"); *In re Rosales*, 621 B.R. 903, 930 (Bankr. D. Kan. 2020) ("Even if this failure was negligent or inadvertent, it is sufficient, in itself, to deny all fees."); *In re Whitcomb*, 479 B.R. at 140 (failure to make full measure of disclosures "required under the Bankruptcy Code and Rules are unacceptable even if they arise merely as a result of negligence or inadvertence."); *In re Perrine*, 369 B.R. 571, 586 (Bankr. C.D. Cal. 2007).  While the Court finds Welch's explanation as evidence that he did not consciously or intentionally fail to make the requisite disclosures, the Court finds such inadvertence does not afford him a mitigating defense to the disgorgement of fees paid him prior to making proper disclosures.

**C.  Whether Welch's Failure to Make a Proper Disclosure of his Attorney's Fees Was Motivated by a Desire to Conceal from SEPH the Expenditure of BP Proceeds Which SEPH Asserts Were Subject to Its Security Interest.**

SEPH has argued that it held a security interest in the Neverve BP claims proceeds, and that security interest was the motive for Welch (and Stewart) concealing the use of those proceeds to pay Welch's attorney's fees.  The Tenth Circuit has instructed this Court to consider any *motive* which Welch had for not making proper disclosure of his fees, noting that even if SEPH's claim of a security interest could not be sustained it "may have caused sufficient concern to induce him (Welch) to avoid the challenges by keeping the payments secret." 970 F.3d at 1269.  Predictably, much of the evidence at trial revolved around the issue of whether SEPH held, or at least whether Welch believed it held, a security interest in the Neverve proceeds.[23]

Directly addressing the Tenth Circuit's instruction to this Court to find whether SEPH's purported security interest was a motive for Welch's non-disclosure of the BP settlement and his attorney fees, Welch testified as follows:

> Q. What influence did your opinion (whether SEPH held a security interest) have on your actions in this case?
>
> A. Quite a bit. I mean, the – from the very beginning of the case through today, in reviewing the Second Supplement, which was in the ZLM loan trying to assert a security interest in Neverve BP proceeds, that was relevant through a number of issues and a number of independent reviews.  And each time my analysis and opinion or understanding of the Second Supplement was that in no way did it create a security interest or any claim against Neverve or Neverve's BP claims.

---

[23] The security interest issue not only impacts the issue of Welch's motive for not disclosing his fees for disgorgement purposes, but also the determination of whether SEPH is the proper party to recover any funds ordered disgorged.  Though Welch has requested it, the Court is not making that determination in this Opinion.

Q. So how did that influence your decision-making and your motivation in this case?

A. In looking at the Neverve BP claims in August 2016 to determine if it had – was encumbered or had a lien or security interest in it, that would have affected my interest because if it was encumbered I would not have used it to pay my fees.

Q. Okay. The Tenth Circuit suggested it might be motivation for not disclosing the application of funds to your fees or disclosing payment of fees to this Court. How do you – you address that issue?

A. At that time there was no knowledge that SE Properties even asserted any security interest. My analysis, in looking at the claim, was that it did not -- it was not encumbered property, and so there was no motivation to conceal or hide anything because it was unencumbered.

[Tr. pgs. 121-122].

There is evidence supporting Welch's testimony that from early in the bankruptcy he did not believe that SEPH held a security interest in the Neverve BP proceeds. Welch testified that in June 2015 he had seen a letter from SEPH attorneys giving notice to some twenty-one (21) parties that SEPH was asserting a legal right to the claims or the proceeds of any settlement or judgment against BP asserted by numerous Stewart affiliates. Neverve was not an addressee of SEPH's letter nor an affiliate named in the letter. [Tr. pgs. 110-111; Welch Ex. 36]. Immediately following the first meeting of creditors on August 21, 2015, Welch had discussions with Trustee Gould concerning the assets and liabilities of the Debtors, including the Neverve opt-out claim. [Tr. pgs. 60-61]. Welch had examined the *Second Supplement* and "through the other review of the Neverve foreclosure and other documents I had reviewed, determined that the -- SEPH did not have a security interest in the Neverve BP claim." [Tr. pg. 64].

26

On the same day of his meeting with Gould, August 21, 2015, Welch emailed Gould and attached SEPH's April 13, 2015, *Notice of Enforced Third-Party Claim* against the Neverve BP claim which it had filed with the BP Claims Administrator. In that email Welch wrote that "I do question whether the notice is a means to perfect the *judgment lien* or if the judgment lien could be perfected in a litigation claim." (emphasis added.) [Welch Ex. 26; Tr. pg. 64]. There was no mention of SEPH holding a consensual security interest. Two minutes after his email to Gould, Welch emailed Neverve's counsel in Alabama inquiring whether SEPH's *Notice of Enforced Third-Party Claim* "is a proper 'Perfection' of a judgment lien on a litigation claim."  [Welch Ex. 26].

Later that evening, Welch emailed Gould that it was Welch's opinion that "of the 6 opt-out claims, 3 of the 6 *(including Neverve) are not pledged to SEPH*." (emphasis added) [Welch Ex. 27].  At trial, Trustee Gould testified that, "[m]y opinion is, is that there is no security interest granted by Neverve to SEPH via the Second Supplement to loan documents." [Tr. pg. 623].[24]

Welch had  known from early in the bankruptcy that SEPH had obtained a judgment in foreclosure against Neverve in Florida, and in that litigation had *not* asserted a lien or other security interest in any commercial tort claims (the BP claims).  Nor, according to Welch's testimony, in his research of the public filings did he find any Uniform Commercial Code financing statement purporting to perfect a security interest in the Neverve BP commercial tort claim.  Welch testified that it was not until the *in camera* hearing of August

---

[24] Trustee Gould did testify that the Neverve BP claims were subject to the judgment held by SEPH. He stated "because SEPH had a multimillion dollar judgment against Neverve, my attitude about the Neverve BP proceeds were that not a penny of it is ever going to go to my estate." [Tr. pg. 625].

27

30, 2017, that he first learned from statements by SEPH's counsel, Richard Gaal, that SEPH was claiming a security interest in the Neverve proceeds.[25]  From the evidence, it appears that the first time SEPH attempted to perfect its Florida judgment lien against Neverve in the State of Oklahoma was in April 2020.  There was no evidence that it ever attempted to perfect a *security interest* in the Neverve BP proceeds in Oklahoma.  All of these facts lend credence to Welch's claim that he did not believe SEPH held a security interest in the Neverve proceeds.

The Court must, however, go beyond Welch's stated belief that SEPH did not hold a security interest in the Neverve BP proceeds and see whether there was an objective, good faith *legal* basis for that belief.  The starting point for this analysis is the *Second Supplement* executed on June 23, 2011, in favor of Vision Bank, the predecessor in interest of SEPH, in conjunction with a Modified Promissory Note with a principal amount of $16 million.

The *Second Supplement* was executed by two limited liability companies as "Borrowers" and four "Affiliates."  David Stewart signed the *Second Supplement* on behalf of four of the six named affiliates as Manager.  Stewart and two other individuals also signed the *Second Supplement* as Guarantors.  Neverve was never named as a Borrower,

---

[25] In its closing argument, SEPH asserts that "Welch, at various times, expressed his belief that SEPH, had a security interest and/or a judgment lien with respect to the Neverve BP proceeds." [Doc. 999, pg. 4]. The parts of the record upon which SEPH relies do not support the conclusion that Welch expressed his opinion that SEPH had a security interest in the Neverve BP proceeds. The evidence only supports a finding that Welch considered that SEPH *might* have a judgment lien, but which he thought might be avoided in the event of a Neverve bankruptcy. Obviously, if Neverve had granted SEPH a consensual security agreement in the Neverve BP proceeds Welch would have known that the same would not be subject to avoidance in a bankruptcy.

Affiliate or Guarantor, or mentioned in the *Second Supplement* and did not sign it.  The *Second Supplement* granted the Lender a security interest in any BP Claims or lawsuits which the Borrowers or Affiliates had.

While Neverve was neither mentioned by name nor signed the *Second Supplement*, SEPH asserts that there is language in the *Second Supplement* which expresses the intent of the parties, including David Stewart as a guarantor, for the grant of a security interest in any BP claim which Neverve held.  The critical language relied upon by SEPH in the *Second Supplement* is as follows:

> 3. BP Claims: All Affiliates Included:
>
> ****
>
> (d) Borrowers acknowledge and agree that the parties hereto intend that all subsidiary companies and affiliate companies of Borrowers are to be parties to this Agreement and are to pledge their respective BP Collateral and bank accounts (discussed below) as collateral for the Loan.  To ensure the foregoing and to induce Bank to enter into this Agreement and extend the maturity date of the Loan, Borrowers and *each Affiliate hereby represent and warrant unto Bank that there are no subsidiary or parent companies of any Borrower or any Affiliate, or any affiliate company of any Borrower (meaning any company owned directly or indirectly or in whole or in part by any Borrower or by any owner or principal of any Borrower), that has filed or possesses any BP Claims that are not a party to this Agreement,* and that no Borrower or Affiliate has pledged or assigned any of their BP Claims, BP Payments or BP Collateral to any person or entity other than Bank.

(Emphasis added) [Welch Ex. 1].

Welch testified that early in the bankruptcy he had reviewed the *Second Supplement* to determine its coverage and what liens could be asserted under it:

> Q. And in -- for that review process, did you consider whether

or not it might cover Neverve?

A. No, I didn't, because --

Q. Tell us why.

A. On the face of the document, it identifies the borrowers and the capital-A affiliates, and the granting clause and the listing of the BP claims covered are only the borrowers and the affiliates. There was no basis for this document to be asserted as a security agreement with Neverve. Neverve was not a party to it. Neverve did not sign it. Neverve's BP claim isn't listed or enumerated in the agreement.

[Tr. pgs. 99-100].

Upon cross-examination at trial, Welch expanded upon his reason why he did not believe that the *Second Supplement* gave SEPH a security interest in the Neverve proceeds:

A. *** The language of it and the time of the question does not put me on notice of any claim by SE Properties that, despite the Second Supplement not having a granting clause as to any other party other than the capital-A affiliates and the borrowers, that based upon a representation and warranty, that you took that to mean that that included other lower-case affiliates, and that – that agreement did not affect the other lower-case affiliates.

At most, it was a breach of a warranty by the borrower signing it, the guarantor signing it, and the other capital-A affiliates signing it. It had no impact or effect on Neverve or Red Snapper or any other – Shimmering Sands Development Company.

[Tr. pg. 361].

Is there a legal basis for Welch's stated belief that Neverve had not granted SEPH a security interest in the BP Proceeds? The *Second Supplement* contains a choice of law provision which provides that the document will be interpreted and construed under the

laws of the State of Alabama. [Welch Ex.1, ¶ 14].  Thus, whether SEPH holds a security interest in the Neverve BP claims proceeds is governed by Alabama law.  Alabama, like all states, has adopted Article 9 of the Uniform Commercial Code (UCC) governing the law of security interests.[26]

Under Alabama law, a "security agreement" is defined as "an agreement that creates or provides for a security interest." § 9-102(74).  In turn, a "security interest" is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." § 1-201(35).  Section 9-203(a) of the UCC provides that in order to be effective, a security interest must have attached to the collateral in question. Unless an agreement between the parties provides otherwise, a security interest attaches to collateral only when it becomes enforceable against the debtor with respect to the collateral. § 9-203(a).

Three elements are required for a security interest to be enforceable: (1) value has been given; (2) the debtor has rights in the collateral or the power to transfer the rights in the collateral to a secured party; and (3) *the debtor has authenticated a security agreement that provides a description of the collateral*. § 9-203(b). (Emphasis added).  Welch does not appear to contest that the first two elements, value given and that the debtor (Neverve)

---

[26] The Alabama UCC is found at Ala. Code § 7-9A-101 *et seq.* For convenience and simplification, the Court shall refer to the applicable Alabama statute only by the corresponding section of the UCC.

The Court sustained SEPH's objection to Welch's seeking admission into evidence of provisions of the Alabama Uniform Commercial Code to determine the granting and perfection of a security interest in a commercial tort claim. Such statutory law is inadmissible because it invades the province of the court to determine the applicable law. See *Specht v. Jensen,* 853 F.2d 805 (10th Cir. 1988). [Tr. 105].

31

had rights in the collateral, are present. His argument is that Neverve never "authenticated," or signed, the *Second Supplement*.

According to UCC § 9-102(a)(7) in effect in Alabama at the time of the execution of the *Second Supplement* in 2011, "'[a]uthenticate' means: (A) to sign; or (B) to execute or otherwise adopt a symbol, or encrypt or similarly processing a record in whole or in part, with the present intent of the authenticating person to identify the person and adopt or accept a record."[27]  Clearly, Neverve did not sign or "authenticate," nor is it even named in the *Second Supplement*.

The above evidence is consistent with Welch's position that from the start of the bankruptcy he *believed* there was both a factual and a legal basis that SEPH did not hold a security interest in the Neverve BP proceeds, and that his failure to make the appropriate Rule 2016 disclosures was not, as questioned by the Tenth Circuit, motivated only by a fear of SEPH successfully laying claim to them.

There may well be legal arguments that SEPH has by which it can succeed on its claim of holding a security interest in the Neverve proceeds.  There are issues of contract

---

[27] Prior to the 1999 amendments to the UCC, § 9-203(b)(3)(B) required a "signed writing". The 1999 amendments changing the language to "authenticate" was intended to permit security agreements in electronic or other non-written media. Comment 9(b) to § 9-102 states: "the terms 'authenticate' and 'authenticated' generally replace 'sign' and 'signed'. 'Authenticated' replaces and broadens the definition of 'signed,' in section 1-201, to encompass authentication of all records, not just writings."

In July 2022 the Uniform Law Commission approved amendments to the UCC, including the deletion of the definition of "authenticate" under § 9-102(a)(7) and replaced it with new section 9-203(b)(3)(A) which makes a requirement that a security agreement "be signed by the debtor".

In Alabama, the 2022 amendments were signed into law to take effect on July 1, 2024. Since the amendments were not retroactive to the attachment or perfection of security interests before the law's effective date, the amendments are not applicable here.

construction, the intent of the parties and possibly estoppel; however, that determination is not currently before the Court.  Under the evidence presented, the Court finds that Welch, whether or not he is ultimately determined to be mistaken on the law, had at least a plausible, good faith  basis for believing that SEPH did not hold a security interest in the Neverve proceeds such that he had a duty to disclose his use of the proceeds or, more importantly, a motive to conceal them from SEPH.  The Court does not find that Welch had a nefarious or fraudulent motive for not disclosing the BP settlement *to SEPH*.  This finding, however, does not provide justification or mitigation for Welch not disclosing his fees and their source *to the Court* as required by Rule 2016.

### D. Welch's Reliance on the BP Confidentiality Order For His Failure to Disclose His Attorney Fees.

On January 13, 2013, the United States District Court for the Eastern District of Louisiana in the BP Claims Multi-District Litigation entered a *Confidentiality Order* which prevented any party from disclosing, discussing, or producing any settlement-related documentation or discussion, including resolution of claims or lawsuits related to the multi-district litigation. [Welch Ex. 10].  The BP settlement was first disclosed to the Court and SEPH at the *in camera* proceeding on August 30, 2017, when Welch stated that the *Confidentiality Order* was the reason any BP settlements, including one for Neverve, had not been previously disclosed.[28]  This Court and the District Court for the Western District of Oklahoma subsequently found that the *Confidentiality Order* was applicable to certain

---

[28] The *in camera* proceeding was necessitated by questions related to the BP claims being made in open court by SEPH's counsel at the hearing on the Stewart's and the Trustee's *Joint Motion to Approve Compromise and Settlement Agreement*. [Doc. 408].  Welch announced that the *Confidentiality Order* prohibited such public discussions regarding the BP claims.

discovery matters in the Stewart-related cases, including this bankruptcy, and relief from the *Confidentiality Order* should be had before certain discovery matters proceeded further. At trial, Welch testified that, "The failure to disclose that [under Rule 2016], or any of the settlement process, was under the Confidentiality Order, or the terms, as I understood them at that point, of the Confidentiality Order." [Tr. pg.131]. The question now before this Court is whether the Confidentiality Order affords Welch a mitigating reason for not having made the requisite attorneys fee disclosures.

Although the first time that Welch saw a copy of the *Confidentiality Order* was on or about July 20, 2017 [Welch Ex. 31], Welch was definitely aware of it prior to the receipt of the BP funds on or about August 3, 2016. On May 13, 2016, Taylor Martino sent an email to Stewart, who forwarded a copy to Welch, attaching BP releases and stating: "[k]eep in mind that the settlement and release are strictly confidential, and you may not disclose information concerning the settlement to anyone." [Welch Ex. 67]. On May 18, 2016, prior to the execution of the Neverve settlement documents and more than two months prior to receipt of the BP proceeds, Welch sent emails to Ed Rowan and Steve Martino, the two attorneys at Taylor Martino handling the BP claims, posing the following question: "Does the Court's Confidentiality Order prohibit the discussion of the settlement process with a third-party claimant or [a] lender claiming an interest in the net proceeds of a claim?" Rowan responded, "I think so." Similarly, Martino responded, "Yes." [Welch Ex. 67, pg. 2].

The concurrence of two lead attorneys in the BP litigation that the *Confidentiality Order* prohibited any disclosure to any non-party of the claims settlement would, under

other circumstances, be a strong mitigating factor on the issue of disgorgement. But here, there are two additional factors weighing against mitigation. First, the disclosure here did not involve a disclosure only to a normal non-party. Rather, the Bankruptcy Code and Rules mandated the disclosure *to the Court*. The *Confidentiality Order* did not obviate an attorney's duty to file *some* disclosures under Rule 2016. To accommodate the strictures of the *Confidentiality Order* and the Bankruptcy Rules, Welch could have filed his disclosure indicating the non-debtor source of the fees as being Neverve but not from settlement of BP claims, filing the disclosures under seal, filing the disclosures but indicating the source was subject to the *Confidentiality Order* or seeking relief from the *Confidentiality Order* for the limited purpose of filing the disclosures.[29] Welch had options that he did not avail himself of.

### E. Welch's Failure to Correct Stewart's False Testimony Regarding Receipt of the Neverve BP Proceeds

The second factor against the *Confidentiality Order* being a mitigating factor, and in this Court's opinion perhaps the most troubling aspect in this entire disgorgement matter, is Stewart's false testimony that the Neverve BP settlement never even occurred and Welch's silence after being present for that testimony. In his June 27, 2017, deposition, taken almost a year after Stewart had signed the settlement documents and Welch' fees had been paid with the Neverve settlement proceeds, Stewart testified as follows:

> Q. (Mr. Gall) Have you paid your attorneys–your attorney since
> the bankruptcy was filed?
>
> A. I have.

---

[29] Such an Order granting relief from the *Confidentially Order* was eventually obtained on April 14, 2021. [Welch Ex. 75].

Q. Personally?

A. Well, I have paid him. He's been paid

Q. I know, but I mean have you personally paid him out of your funds?

A.  I have paid him personally out of our funds.

Q. Has [Mr. Welch] been paid from other sources such as Raven, Oklamiss or any of the -- entities that have been identified?

A. I would have to look and see. I'm not sure.

**** 

Q.  Mr. Stewart, do you know whether any funds have been paid into an escrow for your attorney?

A. I have no idea.

****

Q. Have any of the entities with which you have ever had an interest received, to your knowledge, funds related to the BP claims other than Zeke's or ZLM?

A.  We received some BP claims on the houses on Ono and on the condo that were minimal fixed numbers back in '12, probably.

****

Q. Okay. Other than those, have any of the entities or you received any proceeds from BP claims?

A. I have not.

Q. What about Neverve?

A.  I don't know about Neverve.

****

Q. Okay. To your knowledge, did Neverve make a BP claim?

36

A.  Neverve did make a BP claim.

Q.  Okay. And, again, just to be clear, to your knowledge, have any proceeds or payments or funds been paid on that BP claim by Neverve?

A.  I do not know.

Q. Was that in opt-in or opt-out claim, if you remember?

A. That was an opt-out claim.

Q. Do you have any–any information or knowledge of the payment of any opt-out claims?

A. No. I don't know what's come of those.

Q. I know that during some depositions you and your counsel indicated that there might be–might be some recovery on those opt-out claims. Did that happen?

A. I don't know what Taylor Martino's gotten. They have not paid me.

Q. Do you know who would know other than your counsel?

A. I don't know.

Q. Do you know whether they have reached out to trustee or the trustee had been in discussions with Taylor Martino?

A. I don't know.

****

[Tr. pgs. 502-510; SEPH Ex. 33].

That Stewart's testimony was false is made glaringly clear by an email which he sent to his then in-house counsel, Linda McGuire, on September 13, 2016, only a month after Welch received the BP poceeds:

> *** Keep in mind the opt out claims have been paid and what's left after [a]tt[orney] fees is in Rusty's trust acc[ount]. I assume when seph finds out they've been paid they'll be screaming.***

37

[SEPH Ex. 186, pg. 27].

The Oklahoma Rules of Professional Conduct, Title 5, Chapter 1, Appendix 3-A, Rule 3.3 entitled "Candor Toward The Tribunal," provides, in pertinent part:

> (a) A lawyer shall not knowingly:
>
> ****
>
> (3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.
>
> Comment [1] provides:
>
> This Rule governs the conduct of a lawyer who is representing a client in the proceedings of a tribunal. See Rule 1.0(m) for the definition of "tribunal." It also applies when the lawyer is representing a client in an ancillary proceeding conducted pursuant to the tribunal's adjudicative authority, such as a deposition. Thus, for example, *paragraph (a)(3) requires a lawyer to take reasonable remedial measures if the lawyer comes to know that a client who is testifying in a deposition has offered evidence that is false.*

(Emphasis added).

Bankruptcy attorneys are not guarantors of their client's good behavior. While they must carefully instruct debtors regarding their legal obligations and provide counsel as circumstances arise, they cannot be held responsible when their clients inexplicably go rogue. Yet as an officer of the court, an attorney is duty-bound to timely report a debtor's unauthorized activities or lack of candor to the court. Under no circumstances should an attorney enable the client's wrongful behavior or further the concealment of it.

When an attorney knows that his client has provided false testimony, he is obligated

38

to disclose his client's perjury. *Nix v. Whiteside*, 475 U.S. 157, 168, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) ("both the Model Code and the Model Rules do not merely *authorize* disclosure by counsel of client perjury; they *require* such disclosure") (emphasis in original); *Shade v. Great Lakes Dredge & Dock Co.,* 72 F.Supp.2d 518, 524 (E.D. Pa.1999) ("This rule safeguards principles that are basic to the adversarial system of justice: The excesses of this system would likely overcome its virtues if attorneys were free to represent clients with no regard whatsoever for the truth of their statements to the court."); *In re Hill*, 437 B.R. 503, 542 (Bankr. W.D. Pa. 2010) ("Once [the attorney] read the transcript and realized [the client] had made false statements to the Court, she was under a duty to take remedial action by informing the Court as to any misstatements.").

When asked at trial why he didn't stop the deposition and confer with Mr. Stewart, Welch testified, "Mr. Stewart's memory has a lot of problems selective or otherwise, and I did not stop it and I did not correct it." [Tr. pg. 507].  Welch testified that he knew that Stewart "was playing cute with the answers" in the deposition, but to correct Stewart's testimony would have exposed the settlements under the *Confidentiality Order*. [Tr. pg. 551].  In the Court's opinion, the client's memory, "selective or otherwise," is not a sufficient reason for a client to give false testimony, nor is it a justification for counsel not to correct what he surely must have known was not only "cute," but false testimony.  "Ours is a system built upon the principle of full and candid disclosure." *In re Lewis,* 309 B.R. 597, 602 (Bankr. N.D. Okla. 2004).  That principle was violated by both Stewart and Welch.  The law is clear that Welch should have stated that Stewart's testimony was not entirely correct or, at the very least, was subject to a *Confidentiality Order* which prevented further

discussion of funds received by the various entities and the source and amount of any payments to Welch.[30]

Uncomfortable as it may be, disclosure to the Court of Stewart's false testimony was the only appropriate remedial measure once Welch heard Stewart's testimony. Welch did not disclose receipt of the BP Proceeds until ordered to do so by the Court in the August 30, 2017, *in camera* hearing. "A disclosure of material facts only after their concealment is either no longer beneficial or cannot be maintained is the antithesis of candor." *In re Bush,* 2023 WL 6543194, at *6  (Bankr. W.D. Pa. 2023); *In re Gulczynski,* 2008 WL 906816, at *5 (Bankr. D. Md. 2008).

As indicated above, reliance upon the *Confidentiality Order* might have afforded Welch a mitigating factor for making less than full disgorgement of his fees, but Welch's lack of candor in the face of Stewart's false testimony regarding receipt of the BP Proceeds, in this Court's opinion, negates any mitigation based on the *Confidentiality Order.*[31]

---

[30] In his deposition, when Stewart was asked by SEPH's counsel whether he could get the information as to how much attorney's fees had been paid, Welch interjected "No."  When asked by SEPH's counsel if he was refusing to disclose his fees Welch answered, "Yes." [Tr. pgs. 503-504].  At trial, Welch testified that at the time of the June 2017 deposition he was not aware that he was required to disclose his attorney's fees pursuant to Rule 2016(b), and, like in any civil litigation, he was not obligated to tell the opposing party what he had been paid.  Welch may have believed he need not tell Richard Gaal that he had been paid, but permitting Stewart to lie about it under oath is a whole other matter.

[31] In its S*tewart* opinion the Tenth Circuit noted that "credit should be given to an attorney who manages to convince the client of the need for full disclosure and candor in the proceedings." 970 F.3d at 1268.  No such credit should be given here.

In considering the effect of Welch's  lack of candor in failing to correct his client's false testimony regarding receipt of the BP settlement proceeds, the Court wishes to make clear that it is not imposing a "sanction" on Welch for his conduct.  His lack of candor is, however, a factor to be considered in the totality of circumstances as to whether mitigation of full disgorgement is appropriate.

**F. Whether Welch's Contingency Fee Agreement with Neverve and and other Stewart Affiliates Was an Improper Device to Thwart SEPH and Other Creditors**.

On August 3, 2016, Welch received two separate wire transfers of BP proceeds from Taylor Martino.  The first wire transfer was in the amount of $144,591.85 which Welch claimed as his contingent-fee portion of work performed on the BP claims on behalf of four Stewart entities, including $73,638.45 attributable to his contingency for the settlement of Neverve's claim of $490,393.  Noting that the proximity in time between the execution of the contingency fee agreements and the actual receipt of settlement funds was "pretty late in the litigation to be adding a recipient of a contingency fee,"  the Tenth Circuit questioned the propriety of the contingent fee and instructed this Court to make further inquiry to see if the contingent fees "were merely a device to divert to [Welch] money that would otherwise be available for creditors of the Stewarts' companies." *Stewart,* 970 F.3d at 1268-9.  The Tenth Circuit also stated that there was "a question about the value of the work he purportedly performed to earn that [contingency] fee." *Id.*  The facts giving rise to Welch's contingency fees are, for want of a better word, "unique."

Stewart met with the Taylor Martino attorneys on or about January 2, 2013, regarding its representation of various affiliates, including Neverve, for claims against BP arising out of the oil spill.  No written representation agreement, contingency or otherwise, was made at that time.  Stewart's emails, deposition, and trial testimony were confusing as to what the contingency was to be.  Shortly after his initial meeting with Taylor Martino in 2013, Stewart told senior management at SEPH that the contingency was 25%.  Stewart later told the Trustee and testified in bankruptcy hearings in 2015 and January 2016, that

41

the contingency with Taylor Martino was 20%. Up to that point in time there was no evidence that Welch had in any way participated in the BP claims process or had any direct financial interest in the BP settlement proceeds.

On March 18, 2016, Welch became aware that Taylor Martino had entered into settlement discussions regarding the BP claims. [Tr. pg. 171]. By an email of April 29, 2016, Stewart and Welch were advised by Taylor Martino that offers had been made by the BP claims administrator to settle the opt-out claims of five Stewart affiliates, including the Neverve claim for $565,923 and the Shimmering Sands claim for $156,700.[32] As of that date there was still no written representation agreement with Taylor Martino. The first time that any written evidence indicating that Welch might have an interest in the BP settlement proceeds was in an email from Stewart to Ed Rowen of Taylor Martino on May 13, 2016, requesting Rowan to "confirm the fee is 30% with 1/3 going to Rusty per our prior conversation." [SEPH Ex. 192]. The same day, Rowan replied to Stewart that "I have confirmed the attorney fee is 30%. However, I do not know of any fee sharing agreement with Rusty, and as far as I know, no one on this email chain knows of such agreement." [SEPH Ex. 192]. Three days later, on May 16, 2016, Taylor Martino sent Stewart Employment Contracts for execution by the Stewart affiliates, including Neverve, by which Taylor Martino would receive a 40% contingent fee for any recovery of BP oil spill claims. The contingency fee Employment Contracts were executed by Stewart on May 17, 2016,

---

[32] In another unique feature in this case, Stewart offered to accept the settlement with BP if it would **_decrease_** the amount offered to Neverve from $565,923 to $490,923, $75,000 less than originally offered, and increase the payment to Shimmering Sands from $156,700 to $310,000. At trial, Welch denied being involved in the decision of "switching" to decrease the settlement to Neverve and increase the settlement to Shimmering Sands. [Tr. pg. 547].

but were backdated to April 19, 2016. [Tr. pg. 156].[33]

On May 16, 2016, Welch sent a proposed agreement, backdated to April 19, 2016, to Taylor Martino which provided that Welch would split all attorney's fees for BP oil spill claims on a 50-50% basis with Taylor Martino. Taylor Martino did not agree to that fee split. It was not until June 3, 2016, three weeks after BP had made its settlement offers and only three days before all the BP claims opt-out settlement agreements, including Neverve, were executed did Taylor Martino and Welch agree to their Fee Sharing Arrangement for Employment Contracts by which Welch received a fee equal to 15% of the total amount recovered for each of the BP claims, less one-third for the payment of referral fees to another attorney. [Tr. pgs. 161 and 434; SEPH Ex. 141].

The Tenth Circuit stated that, "Mr. Welch would not be entitled to the fee if it were merely a device to divert to him money that would otherwise be available for creditors of the Stewarts' companies." *Stewart*, 970 F.3d at 1269. Given the timing of the BP settlement process, the "last minute" contingency fee agreements as described above, Welch's confusing testimony as to whether he even represented Neverve,[34] and the fact that the Neverve claim settled for $75,000 *less* than what was offered prior to Welch

---

[33] Although there appears to be no documentary evidence and no one at Taylor Martino remembered it, Welch testified that the contingency Employment Agreements and the Fee Sharing Arrangement for Employment Contracts were backdated to April 19, 2016, because that's "the day that we discussed it and agreed to the fee sharing...." [Tr. pg. 447]. Welch's time records and emails of that day reflect conversations with Taylor Martino concerning Neverve's BP claim, but no mention is made of fee arrangements.

[34] In several depositions and at trial Welch testified that with regard to the BP claims matters that "I did not undertake representation of Neverve directly" [Tr. pg. 382]; rather, he was representing it "indirectly" in that he was "assisting Taylor Martino as co-counsel in their representation of Neverve." [Tr. pg. 383].

executing the contingent fee sharing agreement,[35] this Court believes that the contingency fee sharing agreement *was* constructed as a device to ensure payment of the Welch's bankruptcy fees; however, that doesn't necessarily mean that such structuring was wrongful or subject to sanction by the Court.

Welch had not been paid anything since he undertook the Stewart representation in May 2015. On December 11 and 31, 2015, Welch had written Stewart about not having been paid and the burden of non-payment placed upon him as a sole practitioner. Still, no payment was forthcoming. By the time of the execution of the fee sharing agreement in June, 2016, Welch was owed more than $160,000 with little prospect of payment from Stewart. By the time of the receipt of the Neverve proceeds on August 3, 2016, the balance due for Welch's fees had ballooned to $178,915.76. The Court suspects that when Welch learned of the fortuitous possible settlement of the BP claims, he knew that this was an opportunity to get his bankruptcy fees paid in a lump-sum.

The Court does not view Welch's conduct in structuring the contingent fee agreements for the purpose of getting his fees paid as wrongful *if*, *but only if*, he truly believed that SEPH did not have a perfected security interest or judgment lien on the Neverve proceeds. The Court has already found that Welch had a reasonable, if not unassailable, basis to believe that SEPH did not have a security interest in the proceeds. Welch also was a creditor of Neverve by virtue of its guaranty of Stewarts' bankruptcy fees. Like any creditor, he wanted to be paid first, and Neverve was not in bankruptcy requiring

---

[35] On April 29, 2016, BP offered to settle the Neverve claim for $565,923 [SEPH Ex. 187]. For reasons not entirely clear, Stewart and/or Welch later reached final agreement with BP to increase the offer to settle the Shimmering Sands claim to $310,000 and *decrease* the offer to Neverve to $490,923.

a pro rata distribution to creditors. On the evidence, the Court finds that while Welch's contingency fee agreements were made with the intent to get his bankruptcy fees paid such is not wrongful and sanctionable by this Court.

The Tenth Circuit stated that "there is a question about the value of the work [Welch] purportedly performed to earn that [contingent] fee." 970 F.3d at 1268-69. At trial, Welch testified that he spent approximately ninety-three (93) hours working on matters directly related to the BP claims for all four affiliates, not just Neverve, for which his contingency fee was $144,591.85. SEPH argues that if one calculates those hours at Welch's stated bankruptcy rate of $300 per hour his fee would be $27,900. For the ninety-three (93) hours of work the contingency fee resulted in an hourly rate in excess of $1,500 per hour. Was this excessive for the amount of work performed? Contingency fees often result in far greater attorney fees that would be recovered on an hourly basis; however, the issue before the Court is not whether Welch overcharged Stewart for the work performed on the BP claims litigation. The answer might be in the affirmative if Welch had applied the contingency fees for work performed in the BP claims litigation *and* was also in addition paid for the bankruptcy work from those proceeds. But he didn't do that. He applied all the contingency fees to the hourly amounts due for the bankruptcy work.

The Court must keep its "eye on the ball." It is not for this Court to act as the arbiter of whether Welch was entitled to be paid the contingency fee for work on the BP claims. That is a matter between Welch, his client, and possibly the Bar Association. With regard to the contingency fee agreements, this Court's limited job is two-fold: (1) to determine whether they were simply used as a mechanism to pay attorneys fees for which disclosure must be made, and (2) whether there was anything associated with the contingency fee

45

agreements that would be a mitigating factor against full disgorgement of Welch's fees. Consistent with the instructions from the Tenth Circuit, the Court concludes that (1) the contingency fee agreements *were* created as a mechanism by which Welch could get paid his bankruptcy attorney's fees and were thus subject to Rule 2016 disclosure, and (2) there is nothing in the contingency fee arrangement which would support mitigation of disgorgement.

### F. Whether BP Proceeds Used to Pay Welch for Alledgedly Non-Bankruptcy Services Are Subject to Disgorgement.

At trial and in closing argument, Welch argued that approximately 290 hours totaling $86,700 of the BP contingency fees and "net proceeds" paid him were not "fees rendered in connection with the bankruptcy" but were fees for services rendered for representation of the Stewarts and their affiliates in matters unrelated to the bankruptcy.[36] [Welch Ex. 77 and 78].[37]  Welch asserts that "the fees for services not rendered in connection with the

---

[36] To the Court's knowledge, in the nearly five year history of this disgorgement matter, Welch had not previously made this argument.  He had previously argued that the contingent fees and the "net proceeds" paid to him for representing the affiliates in the BP claims were not "for services rendered in connection with" the bankruptcy case and did not need to be disclosed.  In the Court's April 27, 2018, *Order on Disgorgement* the Court rejected this argument, finding that when Welch elected to take the proceeds from the BP claims and apply them to the hourly fees earned by him in the bankruptcy, those proceeds became payments made "in connection with" the bankruptcy case.

[37] Welch Exhibit 77 is a "Summary of Non–Bankruptcy Time" showing the date of invoice, invoice number, hours worked and the dollar amount of such hours.

Welch Exhibit 78 as testified to at trial by Welch "is an attempt to detail conservatively the time that was not in connection with the bankruptcy so that the Court could distinguish, for disgorgement purposes, time and services rendered in connection with services rendered not in connection with the bankruptcy." [Tr. pg. 349]. The Exhibit is approximately 350 pages of Welch's detailed time billing statements to David and Terry Stewart for the period of June 30, 2015 to October 31, 2020. The statements highlight in yellow the time purportedly expended for non-Stewart bankruptcy matters.

bankruptcy are clearly outside the Tenth Circuit's outer limits of disgorgement and should not be included in any disgorgement order." [ECF Doc. 998, pg. 1]. Welch testified that he had not anticipated filing a fee application for court approval, and as a matter of convenience, he had billed both bankruptcy and non-bankruptcy matters together. [Tr. pgs. 208-210]. The Court does not believe that it has the authority to order the disgorgement of fees Welch earned for services other than bankruptcy.

At trial, there was no testimony regarding as to why any individual, specific time entry was or was not a non-bankruptcy matter.[38] The Court has reviewed all of the approximately six hundred twenty-five (625) individual entries which Welch highlighted as being a non-bankruptcy matter. In viewing Welch's time records, the Court found that approximately one hundred sixty-seven (167) hours of non-bankruptcy related services were rendered prior to the first fee disclosures being made in September 2017. At Welch's rate of $300 per hour this equates to $50,118 in fees.[39] In the Court's opinion, there are some entries which the Court considers as "related" to the bankruptcy which Welch has highlighted as not related. This is most glaringly true for the period from March 2016, when Welch learned of the possible settlement of the BP claims until August 2016, when he received the settlement proceeds and began to apply them to his bankruptcy fees. In this time period alone, Welch attempts to exclude as "non-bankruptcy related" numerous

---

[38] This is not a criticism of the parties. Going over each individual entry would not have been feasible given the 10 hour time limit which the court had allowed each party to present its case.

[39] Non-bankruptcy time performed after disclosures began in September totaled $36,582. As discussed herein, the Court is not ordering disgorgement of any post-disclosure fees, bankruptcy or non-bankruptcy except $7,611 in pre-disclosure time.

entries dealing with the BP claims settlement, including the negotiation of his contingent

fee-sharing  agreement which was the source of the payment of his fees and which lies at

the heart of this disgorgement proceeding. The Tenth Circuit has instructed this Court to

consider the *source* of Welch's bankruptcy fees, including the contingent fee agreements.

The time records reviewed by the Court show that in the March-August, 2016 time

period alone Welsh expended not less than 25.3 hours at $300 per hour, having a value

of $7,611, on his fee arrangements in the BP claims matters that were the only source of

his bankruptcy fees.[40]  The Court regards these services as so closely related to Welch's

---

[40] For a few examples, Welch has totally excluded as "non-bankruptcy related" the following time entries:

4/18/2016: Emails with B. Holmes [Taylor Martino] regarding access to BP Claims Center records.  Review email from BP Claims Center acknowledging receipt of objection to third party claim by SEPH. (.2 hrs)

4/19/2016: Extended telephone conference with S. Martino, E. Rowan and D. Stewart regarding BP claims and information before settlement meeting.  Emails with E. Rowan regarding SEPH appraisals and Neverve documents from production. E-mail with D. Stewart regarding Marriott documents. (1.9 hrs.)

5/5/2016: Numerous emails with D. Stewart and E. Rowan regarding additional supporting documents, reports and appraisals for Neverve BP claim. (.3 hrs.)

5/12/2016: Telephone conference with D. Stewart regarding the analysis of BP Claim settlement, response of SEPH and all or nothing for all Taylor Martino clients. (.4 hrs.)

5/16/2016: Attention to Employment Agreements with Taylor Martino. Correspondence with Taylor Martino confirming fee sharing agreement.  Numerous emails with S. Martino and E. Rowan regarding BP claim representation. Telephone conference with D. Stewart regarding Taylor Martino agreement and BP claims. (1.2 hrs.)

5/16/2016: Emails with C. Trott and E. Rowan regarding releases for SSDC and Neverve settlement of BP claims.  Review releases.  Revised settlement.  Emails with E. Rowan. (1.8 hrs.)

5/18/2016: Telephone conference with D. Stewart regarding BP claims, settlement issues and negotiation of engagement and contingency fee. Email with E. Rowan regarding initialed pages. Teleconference with S. Martino office. Email with D. Stewart regarding settlement agreements for Neverve and Shimmering Sands Development Company. (.8 hrs.)

source of the payment of his bankruptcy fees that they should have been subject to disclosure and, consequently, to disgorgement.

### G. Whether the Fees Paid Welch for Which Proper Disclosure Were Made Are Subject to Disgorgement.

As previously stated, it first came to the Court's, the Trustee's, and SEPH's attention that Welch had been paid his attorney fees with BP claims settlement proceeds without making the disclosures required by Rule 2016(b) at the *in camera* proceeding on August 30, 2017. The Court ordered Welch to immediately file the proper disclosures. On September 14, 2017, Welch filed his first Disclosure of Compensation of Attorney for Debtor which disclosed that as of July 31, 2017, Welch had been paid $348,404.41. On September 13, 2017, the day before the filing of his first disclosure, Welch paid himself another $68,461.33 from the BP net proceeds (non-contingency fee) of Neverve. Disclosure of this payment was first made in the Supplemental Statement to Amended Disclosure of Compensation of Attorney for Debtor's filed December 4, 2017. [ECF Doc. 522]. Between May 3, 2018, and his last fees on May 20, 2020, Welch was paid $176,174.71 comprised of the last $70,397.86 of Neverve net proceeds and $104,450 from

---

6/2/2016: Telephone conference with S. Martino regarding engagement letters and settlements. Prepare correspondence with S. Martino regarding allocation of fees. (.5 hrs.)

8/2/2016: Emails with D. Stewart regarding BP claim proceeds and intercompany debts. (.2 hrs.)

8/3/2016: Numerous emails with D. Stewart regarding intercompany obligations by Neverve. (.3 hrs.)

8/4/2016: Emails with B. Holmes [Taylor Martino] regarding approval of disbursement sheets for BP claims and proceeds. Review and approve disbursement sheets and summary. (.4 hrs.)
[Welch Ex. 78].

other Stewart affiliates which did not have BP claims. Proper disclosure of these payments was made. The total of all payments made to Welch was therefore $524,579.12. SEPH asserts that this is the amount which this Court should order Welch to disgorge.

There is no doubt that the Court has the discretion to order disgorgement of *all* fees paid to Welch; those paid before and after proper disclosure. The Court, however, believes that under the circumstances it would not be appropriate to order disgorgement of the additional $176,174.71 paid Welch after he had received the pre-disclosure $348,404.41 and after making proper disclosures. Within a week of the Court's August 30, 2017, *in camera* order Welch delivered numerous documents regarding his fees to the Court's chambers for *in camera* examination.[41] Beginning on September 14, 2017, and extending over the next four years Welch filed an Initial Disclosure, Amended Disclosure and twenty-five (25) Supplemental Disclosures setting forth in minute detail narrative explanations of the nature of services rendered and the source and the amount of attorney's fees received by Welch supported by documentation.[42]

In the Court's nearly forty years of bankruptcy experience, including private practice, it has never seen such post-petition fee detail provided in a Chapter 7. The Court does not view Welch's disclosure compliance as "too little, too late." Welch has admitted he made a mistake in not making the appropriate disclosures, and the Court believes Welch's statements of contrition are sincere. In exercising its discretion, the Court does not believe

---

[41] See footnote 16.

[42] The Supplemental Statement to Amended Disclosure of Compensation of Attorney for Debtors filed on December 4, 2017, was comprised of 217 pages, exclusive of 100 pages of other material. Welch continued to file disclosures even after October, 2020, when he was allowed to withdraw as attorney for the Stewarts after disgorgement had been sought.

it equitable to order disgorgement of the additional $176,174.71 he received after making proper disclosures, particularly when $104,450 of that amount was paid by Stewart affiliates unconnected with Neverve or other BP claims proceeds.

## VI. Conclusion

For the reasons discussed above, guided by the Tenth Circuit's direction to this Court, Welch's non-disclosure of his fees provides a foundation for the possible disgorgement of *all* compensation in the amount of $524,579.12.   However, the Court concludes that although such a severe sanction is permissible, it is not warranted here. The Court believes that the approximately $350,000 Welsh received and failed to disclose until ordered to do so should be treated differently than the approximately $174,000 for which proper disclosure was made.

The Court deems it plausible, as argued by Welch, that his failure to disclose accurately, completely, and timely the receipt of post-petition payments in this chapter 7 resulted from his ignorance of disclosure under the unique facts of this case.   Though required by Rule 2016, it appears that in practice that disclosure of post-petition attorney's fees are customarily made in chapter 11 and 13 cases, but not for post-petition work performed in chapter 7 cases.   The Court does not believe that Welch's failure to disclose was willful and intentional.   It was, if anything, negligent.   He made a mistake and freely admits the same - but unfortunately for Welch, mistake alone does not absolve him from complying with the Bankruptcy Code and Rules.   Moreover, Welch is certainly not entitled to mitigation of disgorgement of those undisclosed fees where he permitted his client to give false testimony about their receipt.

51

The Court finds that Welch's contingent fee sharing agreement was made for the purpose of assuring payment of the Stewarts' bankruptcy fees.  The Court does not find, however, that the agreement was made for the express purpose of thwarting SEPH's now asserted security interest in the BP settlement proceeds.  Irrespective of Welch's intent, however, all fees allocable to bankruptcy services prior to proper disclosure beginning in September 2017 should be disgorged.

The Court also finds that $7,611 of the $50,118  which Welch claims as payment for non-bankruptcy services performed prior to making his initial disclosures in September 2017 should be ordered disgorged.  That $7,611 in services relate directly to the basis and source of his bankruptcy fees from the settlement of BP claims which he failed to disclose until being ordered to do so by the Court.

Should the punishment of disgorgement extend to fees properly disclosed after the Court's admonition to him on August 30, 2017?  Exercising its discretion, the Court thinks not.  Welch's disclosures of fees paid him after that date went far beyond the detail anything which this Court has ever been made aware.  Welch's promptness and level of cooperation to rectify the noncompliance are appropriate mitigating factors not requiring disgorgement of Welch's post-disclosure fees.  In making this determination, the Court has also taken into consideration the fact that a majority of those fees were paid by affiliates of Stewart unconnected to BP claims settlement proceeds.  Accordingly,

**IT IS ORDERED** that *SE Property Holdings, LLC's Motion for Disgorgement of Compensation Paid to Welch Law Firm P.C., Denial of Unpaid Compensation, and Reimbursement of Property of the Estate Transferred to Third Parties Pursuant to 11*

*U.S.C. § 329(a) and Fed. R. Bankr. P. 2016, 2017, and 9014*, [ECF Doc. 852, filed Oct. 20, 2017] is hereby **Granted in Part and Denied in Part.**

**IT IS FURTHER ORDERED** that Ruston C. Welch and the Welch Law Firm P.C., jointly and severally, are ordered to disgorge and pay to Neverve LLC[43] the sum of $280,897.[44]

**IT IS FURTHER ORDERED** that the Trustee, Douglas Gould, pay to Neverve LLC the $25,000 previously paid to him pursuant the Court's April 27, 2018*, Memorandum Opinion and Order for Disgorgement of Fees.* [ECF Doc. 576].

# # #

---

[43] The court is ordering the disgorgement of any funds to Neverve because it was Neverve's funds that were the source of Welch's bankruptcy fees. What little authority the Court has found, suggests it is the party who made the payments to the attorney that is entitled to receive the disgorgement. *Cf.*, *In re BOH! Ristorante, Inc.*, 99 B.R. 971, 973 (9th Cir. BAP 1989) ("fees paid by a third-party to a professional employed by a debtor-in-possession may be *recovered by the third-party* under § 329, if such fees would not be allowable under § 330 even if the professional had made a timely application for authorization to be employed"); *In re Mayeaux,* 269 B.R. 614, 622 R. (Bankr. E.D. Tex. 2001) (["F]ailure of counsel to obey the mandate of § 329 and Rule 2016 concerning disclosure, and by implication review by the Court, is a basis for entry of an order denying compensation and requiring *the return* of sums already paid.").

SEPH has requested that any funds ordered to be disgorged should be paid to the Chapter 7 Trustee. The Court understands SEPH's concern that the disgorged funds not be paid to Neverve as Mr. Stewart is the member/manager in control of that entity. The problem with paying any disgorged funds to the Trustee is that regardless of whether SEPH is a secured creditor of Neverve (by way of a judgment lien or a security interest) or an unsecured creditor, the Trustee has already testified that there is no equity in Neverve which could enure to the Stewart bankruptcy estate. [Tr. pgs. 600 and 625 ("[M]y attitude about the Neverve BP proceeds were that not a penny of it is ever going to go to my estate ... ")]. The Court cannot impose upon the Trustee responsibility for money which he has indicated does not belong to the bankruptcy estate. If any disgorged funds are ever to be actually paid to Neverve there are legal mechanisms by which SEPH can assert or protect any rights which it might have to the funds.

[44] $348,404 paid Welch pre-disclosure, less $42,507 in pre-disclosure, non-bankruptcy related fees, less the $25,000 disgorgement previously paid.

53